## In re NORTHERN TELECOM LTD. SECURITIES LITIGATION

Max Fecht, Boston International Partners, L.P., Guidance Components Corp., Stephen R. Raab, Leon Shapiro, and Irwin Sternberg, Plaintiffs,

v.

Northern Telecom Ltd., Jean C. Monty, Martin G. Mand, Edward E. Lucente, Roy Merrills, Alan G. Lutz, Desmond F. Hudson, and Frank A. Dunn, Defendants.

Leon Shapiro, Plaintiff,

v.

Northern Telecom Ltd. and Jean C. Monty, Defendants.

Erwin Sternberg, Plaintiff,

v.

Northern Telecom Ltd. and Jean C. Monty, Defendants.

Nos. 93 Civ. 4384, 93 Civ. 4397, 93 Civ. 4432.

United States District Court, S.D. New York.

Sept. 28, 2000.

Wolf Popper LLP, New York City by Stephen D. Oestreich, Lawrence D. Levit, Abbey Gardy & Squitieri, New York City by Joshua Rubin, Kirby McInerney & Squire, LLP, New York City by Jeffrey H. Squire, Daniel Hume, Berger & Montague, P.C., Philadelphia, PA by Jay Robert Stiefel, Schiffrin & Craig, Ltd., Bala Cynwyd, PA by Richard Schiffrin, Stull Stull & Brody, New York City by Howard T. Longman, Law Offices of James V. Bashian, New York City by James V. Bashian, Oren S. Giskan, Savett Frutkin Podell & Ryan, P.C., Philadelphia, PA by Robert Frutkin, for plaintiffs.

Shearman & Sterling, New York City by Stuart J. Baskin, Kathryn L. Tabner, Amanda J. Gallagher, Richard A. Lingg, Jennifer M. Dehmel, for defendants.

## OPINION

CEDARBAUM, District Judge.

Plaintiffs in these consolidated class action suits assert claims against defendants under §§ 10(b) & 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b) & 78t(a), and under Rule 10b–5. The essence of plaintiffs' complaint is that defendants, who were officers of Northern Telecom Ltd. ("Nortel") during the class period, made misleading statements over a period of time concerning the company's business and financial health that artificially inflated the price of Nortel's stock. Extensive discovery has been completed, and defendants move for summary judgment on all claims. For the reasons discussed below, the motion is granted in its entirety.

## BACKGROUND

The following facts are undisputed unless otherwise noted.[1]

### I. The Parties

Plaintiffs Max Fecht, Stephen R. Raab, Guidance Components Corp., and Leon Shapiro together purchased 650 shares of Nortel stock from May 19, 1993 through June 24, 1993. Plaintiffs Boston International Partners, L.P. and Irwin Sternberg collectively bought 35 call options on June 18 and June 28, respectively. The class excludes foreign subjects or citizens who purchased Nortel securities outside the United States. The class period runs from January 26, 1993 through July 20, 1993 (the "Class Period").

Nortel is a Canadian corporation. During the Class Period, its principal place of business was located in Mississauga, Ontario, Canada. The company's common stock is traded on the Toronto, Montreal, New York, Vancouver, London, and Tokyo exchanges. Nortel is a major producer of a variety of communications products, including telephone switching systems.

All of the individual defendants were officers of Nortel during all or part of the Class Period. Jean C. Monty was President and a Director of Nortel and became Chief Executive Officer on March 1, 1993. Martin G. Mand was Nortel's Chief Financial Officer. Edward E. Lucente served as Nortel's Executive Vice President for marketing from 1992 until March 15, 1993. Roy G. Merrills served as a Vice President of Nortel, as Chairman of Nortel's United States subsidiary, Northern Telecom Inc. ("NTI"), and, as of July 1, 1993, in a new position entitled "Executive Vice President of the Americas." Alan G. Lutz was a Senior Vice President and President, Switching Networks, of Nortel until July 1, 1993. Desmond F. Hudson was Senior Vice President of Nortel and President of Northern Telecom Europe. Frank A. Dunn was a Vice President and Nortel's Deputy Controller and later Controller. The complaint alleges that all of the individual defendants are controlling persons under § 20(a) of the Securities Exchange Act of 1934.

### II. Events Preceding the Class Period

During the three years preceding the Class Period, Nortel reported revenues of $6.8 billion in 1990, $8.2 billion in 1991, and $8.4 billion in 1992, respectively. Nortel reported research and development investments of $773.7 million, $948.3 million, and $930.5 million during each of those respective years. Nortel reported earnings per share growth from $1.80 to $2.03 in 1991 and to $2.17 in 1992.

As of 1993, Nortel produced a number of products, including central office digital switching and transmission equipment. A central office switch is essentially a large computer used to direct telephone operations. Nortel's switching software was customized for each customer and provided telephone companies with a variety of features, such as call waiting, call forwarding, and voice recognition. Transmission equipment is necessary to carry high-speed transmission of data and voice over optical fiber networks. In 1992 and 1993, Nortel was awarded substantial contracts by a number of Canadian and United States telephone companies to supply equipment for their networks.

In 1992, revenues from the United States accounted for $4.5 billion, or approximately 54% of Nortel's total revenues. Central office switching revenues worldwide accounted for approximately $4.24 billion, or 50%, of total revenues.

Large telephone networks, such as the network operated by Bell Atlantic (now known as Verizon) in New York, are operated using giant switches installed by, among others, Nortel and engineers of the

1. Few facts in this case are truly undisputed; plaintiffs assert 299 specific objections to defendants' statement of undisputed facts, as well as eleven general objections and six "rebuttal points" spanning twenty pages. Nonetheless, the basic outline of the case described below is not seriously in dispute and no genuine issues of material fact are raised.

Regional Bell Operating Companies ("RBOCs") in centralized locations. Since all of the RBOCs had been part of AT & T prior to its breakup in the early 1980s, they had "inherited" analog switches from AT & T's equipment subsidiary. After the 1984 divestiture, the RBOCs replaced these analog networks at great cost with higher-capacity digital switches. Nortel had success in penetrating that market, as the RBOCs and long-distance carriers replaced their analog switches with products such as Nortel's DMS 100 or DMS 250 digital switching systems.

Nortel internally estimated its United States market share in switching equipment, excluding AT & T's own internal equipment purchases and including MCI and Sprint, at 51% in 1991 and 53% in 1992. At all relevant times, Nortel's principal competitors included AT & T (now Lucent Technologies), Ericsson, Nokia, and Alcatel.

In 1991–93, the largest telephone companies spent billions of dollars upgrading their networks through what Nortel terms "megadeals." Nortel obtained a number of these contracts. In 1991, for example, Nortel won 75% of a $1 billion contract with Ameritech to upgrade Ameritech's analog switching systems. By 1993, Nortel had captured 53% of BellSouth's switching market share. In 1992, Pacific Bell chose Nortel switches in a multi-million dollar contract to replace its remaining analog switches. Also in 1992, MCI awarded Nortel a $225 million network upgrade supply agreement. On January 25, 1993, the day before the Class Period began, Pacific Bell awarded Nortel almost half of a $1 billion contract to upgrade its analog switches.

In 1993, the only major switching deal was NYNEX's replacement of millions of lines of analog switches. Nortel won over half of that contract.

Unlike AT & T, Nortel's closest competitor in the United States digital switching market, Nortel did not compete with RBOCs for telephone customers.

Nortel solicited customer feedback from the RBOCs. Customers were encouraged to evaluate Nortel through regular surveys and Nortel crafted Customer Satisfaction Improvement Plans and Strategic Plans for Customer Satisfaction and Quality to address customers' concerns.

As phone companies spent billions of dollars on new digital networks, Nortel switches became a substantial component of the phone companies' "embedded base." RBOCs expected central office switches to last from ten to twenty years. Nevertheless, central office switches required constant additions and modifications over that period.

III. The DMS Evolution

Software was the greatest cause of dissatisfaction among Nortel's customers in the years leading up to the Class Period. The "BCS" software which operated Nortel's digital switches contained over 20 million lines of code. Nortel's customers demanded a high level of reliability in the switching software. One set of performance benchmarks, called the Local Switching Systems Generic Requirements ("LSSGR") standards, provided that there should be no more than one incident per switch every three years or three minutes of switch downtime per system per year. In 1992, Nortel's software releases had approximately one incident per year and 6.54 minutes of downtime per year. Nortel planned improvements to meet the LSSGR standards and exceed them by 1995.

Starting in mid to late 1992, Nortel's switching unit began the process of changing the architecture of its software, a project referred to as the "DMS Evolution." The objective of the project was to create a core layer of software with semi-customized features layered on top. With such a structure, future development could concentrate on the outer layers, which would simplify and accelerate the development process. In 1992, Nortel committed hundreds of software engineers to this effort.

The project cost for 1993 was estimated at $71 million of a total research and development budget approximating $1 billion. The DMS Evolution included consultation with Nortel's customers to discuss software problems and how they could be corrected.

## IV. The 1993 Budget

Nortel does not publicly disclose its annual or quarterly budgets. In 1992, when the 1993 budget was created, Nortel's senior management developed a set of corporate objectives which were distributed to the business units. Senior management demanded greater budgetary objectives from the business units. One reason the business units resisted committing to higher targets was that incentive compensation depended on meeting yearly budget forecasts. This was true for senior management as well. Management "had a personal incentive to get the board to accept the lowest possible earnings per share budget, because the budget earnings per share became the center of their matrix for their added compensation." (Butler Dep. at 245.) Yearly performance, and not quarterly performance, was used to calculate whether goals had been met. For the fifteen years spanning 1978–92, Nortel achieved its internal budget forecasts in all but three years.

Once the 1993 budget was created by management, it was presented to and approved by Nortel's Board of Directors in December 1992, although it was amended in some respects in January 1993. Management then broke the yearly numbers into quarters. The practice of breaking down the budget by quarters was employed because historically Nortel's revenues, as is common in the telecommunications industry, exhibited a so-called "hockey stick" effect such that revenues were heavily weighted toward the final quarter, when the RBOCs spent the bulk of their capital budgets as approved by public utility commissions.

The approved budget for 1993 forecast a record year for 1993 in all respects: revenues of $9.4 billion, up 12%; orders of $9.7 billion, up 6%; and earnings per share of $2.35, up from $2.17 in 1992. In the U.S., a similar record was forecast in revenue, including switching.

## V. The Class Period

### A. Statement One

On January 26, 1993, Nortel issued a seven-page news release reporting results for 1992, including record orders, revenues, and earnings. The first of the six challenged statements ("Statement One") is an excerpt from the first sentence of a paragraph on page six which reads, "[o]ur product lines have never been stronger. . . ." Following this release, Nortel's share price rose $2.50 per share to $44.75. Neither the financial press nor analysts' reports ever referred to Statement One.

Two days after the statement, Paul Stern announced that he would step down as CEO effective March 1, and would become non-executive chairman. Jean Monty, then President and COO, became the new CEO.

### B. Statement Two

On March 9, 1993, Nortel issued a four-page news release announcing several internal management changes in marketing and sales. The second challenged statement ("Statement Two") is an excerpt from a quotation on page three from Dennis Matteucci, NTI's new Vice President for sales, that "we will continue to deliver the best of new technologies. . . ." Nortel's share price declined after this news release was issued. Neither the financial press nor analysts' reports ever referred to Statement Two.

### C. Statements Three and Four

On March 25, 1993, Nortel released its fifty-page annual report for 1992. The third challenged statement ("Statement Three") appears on page thirteen and reads, "Northern Telecom has been cementing relationships with telephone companies through long-term contracts for

network upgrades." The report goes on to describe agreements reached in late 1991 and 1992 with Pacific Bell, Ameritech, U.S. West, Southwestern Bell, and other telephone companies. The fourth challenged statement ("Statement Four") appears on page seven of the report. It paraphrases Desmond F. Hudson, president of Northern Telecom Europe, who claims that "[t]he company's first major European investment—the acquisition of STC PLC in the United Kingdom—is already yielding significant benefits." Hudson goes on to explain that "[l]ast year, we won a $370 million contract for the first undersea optical fiber cable between Canada and Europe." Following the release of the annual report, Nortel's share price declined. The financial press never referred to Statement Three or Statement Four. Statement Four appeared in some analysts' reports.

### D. Statement Five

By February 1993, Nortel's internal flash reports showed that there was a risk of variance from budgeted projections for the first quarter. Nortel's management practice, referred to as assigning "taskings," is to commit the executives in the field to work harder to make up such a shortfall. In February and March, taskings were assigned. However, notwithstanding the taskings, before the quarter's end, it appeared likely that Nortel would fall short of its internal forecasts.

Nortel's Board of Directors met on March 25, 1993. Management made a presentation to the board explaining that performance for the first quarter was likely to be disappointing. On that same afternoon, Nortel issued a two-page news release warning in the first sentence that "earnings for the first quarter of 1993 will be below 1992's record performance and analysts' expectations." The reasons cited for the cautious earnings estimate included increased strategic R & D and international market development expenditures, lower software revenues, and lower pricing in central office switching in North America. The report quotes Monty, then Nortel's president and CEO, on the outlook for 1993: "Although we are not satisfied with expected first quarter results, as we look to the remainder of the year we are encouraged by the improving economies in North America and our market successes in the Asia Pacific and Caribbean and Latin America regions."

The fifth challenged statement ("Statement Five") is the next and last sentence of the paragraph, which reads, "In addition, our record backlog from 1992 supports our cautiously optimistic view that 1993 will be a year of good performance." Nortel's share price declined after the news release was issued. Statement Five appeared in the financial press, but not in analysts' reports.

### E. Statement Six and the April View

In April 1993, Nortel reviewed its annual budget to determine whether the company's performance was matching the budget projections, a process referred to within the company as the "April View." The April View in 1993 focused on the United States market. Gerry Butters, President of NTI, presented the results of this review to Nortel's senior executives on April 26. The April View pulled together results for the recently-completed first quarter by product area, identified reasons why the quarter had "slipped" off budget, identified customer concerns and action plans to correct them, and set forth opportunities for enhancing revenue and earnings. It then offered the view of NTI's senior executives and their revised internal forecasts.

The April View revealed that NTI had fallen behind 1993's unpublished budget, except for new orders which were ahead of budget. However, the report also projected that the second quarter would still result in improvements over 1992 in revenue, profit margin, and contribution to earnings. Forecasts regarding the full year had NTI on budget in new orders and behind budget but equal to or ahead of 1992 in revenue, profit margin, and contribution to earnings.

On April 27, Nortel issued a three-page news release reporting first quarter results. The sixth challenged statement ("Statement Six") was made by Monty and appears in the middle of the last paragraph of the release: "In North America, expected good access line growth combined with the improving economy and a strong order backlog suggest a quarterly financial profile similar to 1992." Nortel's share price increased slightly after this statement was made. Statement Six is the only statement that appeared in both the financial press and analysts' reports.

### F. Events Following the Last Challenged Statement

On April 29, Nortel held its annual shareholders meeting in Vancouver. Nortel's directors privately convened and Butters made a presentation and a slide show about the United States market and prospects for the rest of the year. Butters explained that 1993 would match or exceed 1992's record results in every category except new orders. Butters also explained that NTI was contacting its key customers "CEO to CEO" to foster relationships. Despite the software rearchitecture program and customer calls for quicker progress, he told the board that NTI's market share was projected to increase in all key product lines, including switching. Butters' presentation to the board took place two days after the last of the six challenged statements.

The Executive Committee of the Board of Directors was scheduled to meet at the end of May. Monty wrote a memorandum calling for board discussion of "operational" and "strategic" issues with respect to Nortel's global business. Three developments occurred in May that put further pressure on meeting budget forecasts. First, Canadian regulators unexpectedly denied Bell Canada a rate increase, requiring it to cut back equipment purchases. Second, Nortel lost a key transmission contract with BT in the U.K. Finally, the release of Nortel's BCS 35 software slipped into the forty-first week of 1993.

On June 11, 1993, Butters wrote to Monty and Mand a memorandum marked "Private—For Your Eyes Only" which included updated 1993 projections for NTI. The memorandum projected revenues to be above 1992 but below the annual budget and April View forecast. The memorandum projected orders and contribution to earnings to be below 1992, the annual budget, and the April View forecast. The June 11 memo was the first time that Butters informed Nortel that NTI projected that its annual results would be below those projected by the April View.

### G. The June 25 Board Meeting and Press Release

At the June 25 board meeting, Mand made a presentation regarding the financial outlook and the likelihood of a loss for the second quarter. At this meeting, the board learned for the first time that quarterly results were going to fall below what it had expected.

Immediately after the board meeting, Nortel issued a press release reporting a loss for the second quarter of 1993. The release quoted Monty: "The anticipated results principally reflect lower than expected public switching sales and continuing price pressures which will reduce gross margins in the quarter and the year." Monty continued: "In view of anticipated first half performance and the current outlook for the rest of the year, earnings for 1993 are expected to be significantly below 1992." Following this release, Nortel's share price declined from $37 to approximately $29.

### H. The July 20 Board Meeting and July 21 Press Release

To address the company's projected shortfalls, management considered a variety of restructuring plans. One alternative management considered was writing down some of STC's goodwill, which had been amortized over a forty-year period when Nortel acquired STC. Management was also considering selling STC's subma-

rine cable business to Alcatel for $900 million.

The Audit Committee of the board met on July 20 and heard presentations on the appropriate accounting treatment for the submarine sale and STC goodwill, as well as for proposals for job cuts and acceleration of the DMS Evolution software plan. On July 21, Nortel issued a news release announcing a $1.03 billion loss for the second quarter and likely loss for the year, most of which consisted of accounting charges of $940 million, including a write-down of $500 million in STC's goodwill. The release also reported approval of sale of the submarine cable business for $900 million and acceleration of the DMS Evolution program. Following this announcement, Nortel's share price dropped slightly.

### V. This Action

Two class action complaints were filed on June 28, 1993. Further complaints were filed following the July 21, 1993 announcement. On January 21, 1994, I dismissed all of the complaints from the bench and granted plaintiffs leave to replead.

Plaintiffs filed an amended complaint challenging twenty statements as false or misleading. On August 19, 1994, I dismissed the complaint as to all but six of the statements.

On March 24, 1999, I allowed plaintiffs to file an amended complaint incorporating two new allegations in addition to the claims based on Statements One through Six. The first new allegation is that defendants committed accounting fraud by improperly recognizing revenue for certain products in 1992. Second, plaintiffs cite two sentences on page sixteen of what appears to be a twenty-seven page conference call transcript dated April 27, 1993. Plaintiffs allege that a Nortel representative stated during this call that "[w]e do not have a particular reason why [software] would be down in the first quarter" and "as far as what happened in the last 90 days, there's really no fundamental reason

you could point to." (Pl.Ex. Q.) Plaintiffs assert that this statement was a material misrepresentation.

Discovery has been completed.

### DISCUSSION

■ To state a claim under § 10(b) or Rule 10b–5, "plaintiffs must prove that [defendants] (1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury." *In re Int'l Bus. Machs. Corporate Sec. Litig.,* 163 F.3d 102, 106 (2d Cir.1998) (*"IBM"*). Defendants move for summary judgment on the ground that plaintiffs cannot prove the first, second, and fifth elements of their claims. A failure of proof on any one of these three essential elements of plaintiffs' claims "necessarily renders all other facts immaterial" and requires summary judgment in favor of defendants. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986).

### I. CAUSATION/INJURY

#### A. Legal Standard

■ To establish the causation element of a securities claim, plaintiffs must provide evidence of two types of causation—"transaction causation" and "loss causation." *First Nationwide Bank v. Gelt Funding Corp.,* 27 F.3d 763, 769 (2d Cir. 1994); *Grace v. Rosenstock,* 228 F.3d 40 (2d Cir.2000).

■ Transaction causation requires proof "that the violations in question caused the [plaintiff] to engage in the transaction in question." *Grace,* 228 F.3d at 45 (quoting *Bennett v. United States Trust Co. of New York,* 770 F.2d 308, 313 (2d Cir.1985)) (alteration in original). Transaction causation is also referred to as reliance. *See Fellman v. Electro Optical Sys. Corp.,* No. 98 Civ. 6403 LBS, 2000 WL 489713, at *11 (S.D.N.Y. Apr. 25, 2000). Reliance is presumed where plain-

tiffs invoke, as here,[2] the "fraud on the market" theory. *Basic, Inc. v. Levinson*, 485 U.S. 224, 245–47, 108 S.Ct. 978, 990–92, 99 L.Ed.2d 194 (1988). Under the fraud on the market theory, "in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business." *Id.* at 241, 108 S.Ct. at 989 (quoting *Peil v. Speiser*, 806 F.2d 1154, 1160–61 (3d Cir.1986)). More important, under this theory, misrepresentations can defraud purchasers of stock even if the purchasers do not directly rely on the misrepresentations. *Id.* However, this presumption of reliance may be rebutted through "[a]ny showing that severs the link between the alleged misrepresentation and . . . the price received (or paid) by the plaintiff," because "the basis for finding that the fraud had been transmitted through market price would be gone." *Id.* at 248, 108 S.Ct. at 992.

■ Loss causation requires plaintiffs to prove that "the economic harm that [they] suffered occurred as a result of the alleged misrepresentations." *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir.1992). *See also AUSA Life Ins. Co. v. Ernst and Young*, 206 F.3d 202, 216 (2d Cir.2000) ("We have consistently said that 'loss causation in effect requires that the damage complained of be one of the foreseeable consequences of the misrepresentation.'") (quoting *Manufacturers Hanover Trust Co. v. Drysdale Secs. Corp.*, 801 F.2d 13, 20 (2d Cir.1986)).

Defendants argue that there is no evidence that the misrepresentations challenged by plaintiffs affected Nortel's stock price and that plaintiffs thus cannot prove loss causation. Decisions by the Second Circuit addressing loss causation fall into two overlapping categories: cases involving individual plaintiffs and cases addressing a separate aspect of loss causation—

whether the misrepresentation at issue "was the cause of the actual loss suffered." *Citibank*, 968 F.2d at 1495. The Second Circuit has not yet explained whether in the context of a class action an argument such as defendants' should be considered under the rubric of loss causation or transaction causation. At least two other circuits, along with at least one judge of this district, have held that evidence of the effect of misrepresentations on stock price should be considered under the rubric of loss causation. *See Semerenko v. Cendant Corp.*, 223 F.3d 165, 184 (3d Cir.2000) ("[W]here the claimed loss involves the purchase of a security at a price that is inflated due to an alleged misrepresentation, there is a sufficient causal nexus between the loss and the alleged misrepresentation to satisfy the loss causation requirement."); *Knapp v. Ernst & Whinney*, 90 F.3d 1431, 1438 (9th Cir.1996) ("In a fraud-on-the-market case, plaintiffs establish loss causation if they have shown that the price on the date of purchase was inflated because of the misrepresentation."); *Fellman*, 2000 WL 489713, at *12.

Ultimately, the distinction is unimportant in this case because both sides agree that plaintiffs must show that the statements they are challenging inflated Nortel's share price. Regardless of whether this evidence is considered proof of loss causation or transaction causation, summary judgment is appropriate if plaintiffs cannot provide such evidence.

### B. The Evidence

Plaintiffs and defendants each proffer an expert witness on the issue of causation.

Defendants' expert, Charles Cox, conducted an "event study" analysis to determine whether the six statements at issue had any impact on the trading price of Nortel's stock. An event study uses re-

---

2. Even the named plaintiffs and their agents are unable to testify that they actually relied on the statements at issue. *See, e.g.*, Eisenberg Aff. ¶ 5 ("I *would have* considered [the

statements at issue] as fundamental and highly important in making a decision whether to invest in Northern Telecom securities.") (emphasis added).

gression analysis and other statistical techniques to model the effect that public statements have on a particular company's trading experience and normalizes that experience to factor out performance of the stock market generally or of stocks in relevant related indices. Cox performed an event study for the period spanning 1992 through 1993. Using this statistical sample, he focused on the reaction of Nortel's stock price to the releases of the six statements at issue.

Cox concluded that none of the six statements resulted in inflation of Nortel's stock price. More generally, he concluded that none of the six statements had any effect whatsoever on Nortel's stock price. Cox also noted the absence of press or analyst interest in the challenged statements. Cox performed a supplemental analysis with respect to the accounting fraud allegation added in the most recent amended complaint. He concluded that he could not identify any effect of the allegedly improper revenue recognition on Nortel's stock price.

Plaintiffs' expert, John Torkelsen, also analyzed the effect of the six statements on Nortel's stock price. Plaintiffs do not argue, and Torkelsen does not opine, that the six statements themselves inflated or artificially maintained the level of Nortel's stock price. Indeed, Torkelsen admits that he is unprepared to testify that the six statements had any effect on Nortel's stock price, or that in the absence of the statements, Nortel's stock would have traded differently. When asked "would the stock have traded differently" if Statement One were never made, Torkelsen replied "I have no opinion." (Torkelsen Dep. 33–35.) When asked the same question with respect to Statement Two, Torkelsen again stated that he was not prepared to testify that if the statement had not been made, Nortel's stock would have traded differently. (*Id.* at 52.) He provided the same response with respect to Statements Three, Four, and Five. (Id.46–48; 56–58.) With respect to Statement Six, he testified that the statement "may well have" caused Nortel's stock price to in-

crease. (*Id.* at 71.) However, he later admitted that "I am not prepared to tell you in what amount because I have not analyzed that." (*Id.* at 74.) Torkelsen was not asked to analyze causation or damages with respect to plaintiffs' claim of accounting fraud. (*Id.* at 42.)

Instead of analyzing whether the six statements themselves inflated Nortel's stock price, Torkelsen was asked to assume that Nortel was obligated to disclose certain negative information to the market in order to prevent the six statements from being misleading when made. Thus, his calculations of the level of inflation of Nortel's stock price above its "true" price rest on the premise that if defendants had disclosed certain information earlier, Nortel's stock price would have been lower. Specifically, Torkelsen was asked to make the following four assumptions:

(a) On January 26, 1993, defendants should have disclosed that Nortel was experiencing weaknesses in its principal product line, central office switching equipment and software, including its quality and development, that it was concerned with such weaknesses and that it was unable to project what impact those weaknesses may have on its 1993 results;

(b) On March 25, 1993, defendants should have disclosed that they were not optimistic that 1993 would be a year of good performance;

(c) On April 28, 1993, defendants should have disclosed that they expected a loss in the second quarter of 1993 and expected earnings for 1993 as a whole to be significantly below those in 1992; and

(d) Finally, on June 25, 1993, defendants should have disclosed that they expected a loss for 1993 as a whole.

(Torkelsen Aff. Ex. B. ¶ 7.) Torkelsen's analysis is thus based not on the theory that defendants made misrepresentations that inflated Nortel's stock price, but rath-

er on the theory that defendants omitted to disclose information that would have deflated Nortel's stock price.

## C. Analysis

There are only two possible situations in which Torkelsen's testimony would show causation: if defendants had a duty to disclose the information contained in Torkelsen's four assumptions earlier than they did, or if defendants had a duty to update or correct prior statements once they acquired new information that made the prior statements misleading. As will be explained below, defendants were faced with neither of these situations.

■ The four assumptions on which Torkelsen's analysis is based can be placed into three categories. The first category includes the disclosure called for in assumption (b), that "[o]n March 25, 1993, defendants should have disclosed that they were not optimistic that 1993 would be a year of good performance." This assumption is puzzling because it is the opposite of the statement actually made on that date (referring to "our cautiously optimistic view that 1993 will be a year of good performance"). Such a "disclosure" was not required. It was not required under a general duty to make forecasts, because, as discussed below, companies do not have such a duty. Moreover, even if Nortel had a duty to forecast 1993's performance, it did in fact make a forecast on that same day. Whether that forecast was reckless or false is a separate issue, and as discussed above, the forecast in any event had no effect on Nortel's stock price. Finally, under plaintiffs' theory, any misrepresentation could be recharacterized as an omission in order to prove causation, a strategy which would eliminate the requirement that a misrepresentation inflate stock price.

■ The second category includes two specific disclosures that Nortel did make but that plaintiffs contend should have been made on earlier dates. First, on June 25, 1993, Nortel disclosed in a news release that it was reporting a loss in the second quarter of 1993 and that it expect-ed earnings for 1993 to be significantly below earnings for 1992. Plaintiffs argue that this information should have been disclosed on April 28, 1993. Second, on July 21, 1993, Nortel disclosed that it expected a loss for 1993 as a whole. Plaintiffs argue that this disclosure should have been made on June 25, 1993. Both of these suggested disclosures call for forecasts.

■ Defendants were not required to make either of these disclosures earlier than they did. "[A] corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Securities Litig.*, 9 F.3d 259, 267 (2d Cir.1993). As the Second Circuit once explained, "[w]e do not suggest that material facts must be disclosed immediately; the timing of disclosure is a matter for the business judgment of the corporate officers entrusted with the management of the corporation within the affirmative disclosure requirements promulgated by the exchanges and by the SEC." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 850 n. 12 (2d Cir.1968) (en banc).

The business judgment rule applies with even greater force to a company's decision on whether and when to make public forecasts. "The federal securities laws do not obligate companies to disclose their internal forecasts." *In re Burlington Coat Factory Securities Litig.*, 114 F.3d 1410, 1427 (3d Cir.1997). *See also In re Convergent Techs. Securities Litig.*, 948 F.2d 507, 516 (9th Cir.1991) (explaining that a company is generally "not obliged to disclose [its] internal projections"); *In re Ivan F. Boesky Securities Litig.*, 825 F.Supp. 623, 635 (S.D.N.Y.1993) (explaining that "corporations and their management are under no general duty to disclose"). It is undisputed that Nortel followed a policy of not regularly disclosing its internal budget or projections. There is no allegation, let alone any evidence, that Nortel participated in or endorsed analysts' positive projections. Accordingly, defendants had "no duty to disclose [the company's] own forecasts or to warn the analysts (and the

public) that their optimistic view was not shared by the company." *Elkind v. Liggett & Myers, Inc.,* 635 F.2d 156, 163 (2d Cir.1980).

Additionally, the SEC has promulgated specific rules establishing mandatory disclosure obligations, and there is no dispute that defendants complied with these requirements. Quarterly results are due forty-five days after the close of the first through third quarters of a year, 17 C.F.R. § 249.308a, and annual results are due ninety days after the close of the fiscal year. 17 C.F.R. § 249.310. It is undisputed that defendants made these disclosures earlier than they were obligated to do so by SEC rules. Moreover, the SEC has expressly stated that companies are not required to make forecasts. 17 C.F.R. § 229.303, Instruction No. 7, ¶ 303(a). The rule that there is no obligation to pre-announce results has long been embraced by courts. *See, e.g., Financial Indus. Fund, Inc. v. McDonnell Douglas Corp.,* 474 F.2d 514, 518 (10th Cir.1973) (en banc); *Fisher v. Plessey Co.,* 559 F.Supp. 442, 449 (S.D.N.Y.1983); *In re N2K Securities Litig.,* 82 F.Supp.2d 204, 208 (S.D.N.Y.2000). Accordingly, defendants were not required to make either of the forecasts at the time plaintiffs suggest.

 Finally, the third category of assumptions includes general disclosures that Nortel did not make but that plaintiffs contend should have been made. Specifically, plaintiffs argue that Nortel should have disclosed on January 26, 1993, the beginning of the class period, that Nortel was experiencing weaknesses in its principal product line, that it was concerned with such weaknesses, and that it was "unable to project what impact those weaknesses may have on its 1993 results." However, "an omission is actionable under the securities laws only when the [defendant] is subject to a duty to disclose the omitted facts." *Time Warner,* 9 F.3d at 267. A company is generally not obligated to disclose internal problems because "[t]he securities laws do not require management to 'bury the shareholders' " in internal de-

tails, *Convergent Techs.,* 948 F.2d at 516 (quoting *TSC Ind., Inc. v. Northway, Inc.,* 426 U.S. 438, 448–49, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)), and because public disclosure of internal management and engineering problems falls outside the securities laws. *Santa Fe Ind., Inc. v. Green,* 430 U.S. 462, 479, 97 S.Ct. 1292, 1304, 51 L.Ed.2d 480 (1977) (holding that "[section] 10(b) d[oes] not seek to regulate transactions which constitute no more than internal corporate mismanagement") (quoting *Superintendent of Ins. of the State of New York v. Bankers Life and Cas. Co.,* 404 U.S. 6, 11, 92 S.Ct. 165, 168, 30 L.Ed.2d 128 (1971)); *Acito v. IMCERA Group, Inc.,* 47 F.3d 47, 52–53 (2d Cir.1995).

Plaintiffs have not shown that defendants were obligated to disclose Nortel's software and customer problems or to state that the company was unable to make a forecast. Plaintiffs cite no case in which a company has been held to be generally obligated to disclose internal problems merely because those problems were potentially significant. Indeed, courts generally do not impose a duty to disclose in such circumstances. *See, e.g., In re Union Carbide Class Action Securities Litig.,* 648 F.Supp. 1322, 1323, 1327–28 (S.D.N.Y.1986) (holding that failure to disclose numerous safety defects and risks associated with defendant's Bhopal plant did not violate any duty to disclose despite the resulting "worst industrial accident in history"); *Convergent Techs.,* 948 F.2d at 515–16 (holding that company had no duty to disclose problems in implementing significant engineering changes for manufacturing workstations and laptop computers); *Hillson Partners Ltd. Partnership v. Adage, Inc.,* 42 F.3d 204, 213 (4th Cir.1994) (holding that company had no duty to disclose problems in completing significant capital improvement projects). Thus, defendants were not obligated to disclose Nortel's customer and product problems on January 26, 1993.

 Plaintiffs attempt to solve this problem by tying the disclosure to statements that were actually made, namely

Statements One though Three. Plaintiffs argue that defendants had a duty to correct or update the information in those statements by disclosing Nortel's customer and product problems.

■■ It is correct that a duty to disclose is created "whenever secret information renders prior public statements materially misleading." *Time Warner,* 9 F.3d at 268. Nonetheless, plaintiffs' argument lacks merit. First, this argument is merely a repackaging of plaintiffs' effort to convert misrepresentations into omissions. A duty to correct or update, by definition, only arises with respect to "prior" public statements. *Id.* Plaintiffs identify no prior statement that a January 26, 1993 disclosure was necessary to correct or update. Moreover, statements One through Three were all made on or after that date. The duty to update or correct prior statements is thus inapplicable.[3] Second, as discussed above, none of the challenged statements had any effect on Nortel's stock price. Thus, with respect to damages, there was no inflation in the company's stock price that a correction or update was necessary to negate.

Plaintiffs respond that their theory is that the six statements artificially *maintained* Nortel's stock price, not that the statements *increased* the price. Regardless of whether the statements are characterized as "maintaining" or "inflating" Nortel's stock price, there is no evidence that the statements had any effect whatsoever on the stock price. Defendants' own expert testified that there was no such effect.

None of the cases cited by plaintiffs suggest that to prove causation, it is not necessary to offer evidence showing that the challenged conduct artificially maintained or inflated the company's stock price. For example, *In re Blech Securities Litig.,* 928 F.Supp. 1279 (S.D.N.Y. 1996), and *Westwood v. Cohen,* 838 F.Supp. 126 (S.D.N.Y.1993), addressed motions to dismiss on the face of the complaint and merely held that allegations that stock price was artificially maintained at a higher level by misrepresentations or omissions were sufficient to state a claim for relief. The courts in those cases were not required to test the sufficiency of the evidence in support of those assertions, as is required on a motion for summary judgment.

■■ Moreover, Torkelsen's testimony is fatally deficient in that he did not perform an event study or similar analysis to remove the effects on stock price of market and industry information and he did not challenge the event study performed by defendants' expert. This situation is similar to that in *Goldkrantz v. Griffin,* No. 97 Civ. 9075(DLC), 1999 WL 191540 (S.D.N.Y. Apr.6, 1999), *aff'd,* 201 F.3d 431 (2d Cir.1999). In *Goldkrantz,* defendants' expert conducted an event study analysis and concluded that the price changes at issue in that case were unrelated to the representations in dispute. Plaintiff's expert, on the other hand, did not perform an event study or contest the study performed by defendants' expert. Accordingly, the court granted summary judgment to defendants because of "the failure of plaintiff to contest that the defendants' Event Study Analysis reliably isolates firm specific price changes and that none of the statistically significant changes are explainable by the release of information related to the licensing agreements." *Id.* at *5.[4] *See also In re Executive Telecard, Ltd. Securities Litig.,* 979 F.Supp. 1021, 1025–27 (S.D.N.Y.1997) (precluding testi-

---

3. As discussed in Part III, *infra,* Statements One through Three were not material and as such could not have triggered a duty to update or correct in any event. *See Basic,* 485 U.S. at 238, 108 S.Ct. at 986–87; *IBM,* 163 F.3d at 110; *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Companies,* 75 F.3d 801, 810–11 (2d Cir. 1996).

4. The court also noted that the lack of reaction in the financial press to the challenged activity was "nearly sufficient, by itself, to carry [defendants'] burden." *Goldkrantz,* 1999 WL 191540, at *5. The holding in *Goldkrantz* carries even greater weight in the present case because in *Goldkrantz,* defendants were moving for summary judgment based on an affirmative defense on which they bore the

mony by damages expert because of expert's failure to conduct event study); *In re Oracle Securities Litig.*, 829 F.Supp. 1176, 1181 (N.D.Cal.1993) ("[u]se of an event study or similar analysis is necessary more accurately to isolate the influences of information specific to Oracle which defendants allegedly have distorted").[5] Similarly, in this case, Torkelsen is unprepared to offer any testimony refuting defendants' expert's event study analysis. (Torkelsen Dep. at 22.)

Plaintiffs distinguish the cases cited above by once again drawing a distinction between inflation of a company's stock price and artificial maintenance of that price, explaining that Torkelsen intends to testify that defendants' omissions artificially maintained Nortel's stock price. In plaintiffs' view, an event study would be unhelpful under such an approach. However, if there is a distinction to be drawn, it favors treating an analysis like Torkelsen's with even greater scrutiny than that addressed in cases like *Goldkrantz*. It would be an odd rule to allow greater leeway to an expert's speculative and hypothetical analysis about what would have happened to a company's stock price if certain information had been disclosed than to an expert's analysis about what in fact happened to a company's stock price when certain representations were actually made. Testimony of a hypothetical nature must be evaluated especially carefully to ensure that conclusions concerning price "maintenance" rule out causes for that maintenance other than the defendants' purported failure to disclose certain information. *See generally Grace v. Rosenstock*, 228 F.3d 40, 45 (2d Cir.2000) ("In framing the contours of private rights of action implied under the 1934 Act, the courts have sought to exclude, as a matter of law, claims based on hypothetical circumstances or speculation."). Plaintiffs' expert is not prepared to rule out such alternative causes or attack the opposing conclusions of defendants' expert. Accordingly, plaintiffs have not met their burden of coming forward with evidence creating a triable issue of fact on whether the statements or omissions at issue inflated or maintained Nortel's stock price.

Finally, plaintiffs do not offer any evidence that either of the claims that were added to the most recent version of the complaint (accounting fraud and a conference call statement) had any effect on Nortel's stock price. Torkelsen admitted at his deposition that he had not been asked to perform any analysis of the effect of alleged accounting irregularities on Nortel's stock price (Torkelsen Dep. at 41–42) and plaintiffs have cited no other evidence showing such an effect. Nor have plaintiffs proffered any evidence showing that the alleged conference call statement affected Nortel's stock price.[6] In contrast,

burden of proof under § 11(e), unlike the present case in which plaintiffs bear the burden of proving causation.

5. Plaintiffs' reliance on *RMED Int'l, Inc. v. Sloan's Supermarkets, Inc.*, No. 94 Civ. 5587, 2000 WL 310352 (S.D.N.Y. Mar.24, 2000) (RLE), *aff'd*, 2000 WL 420548 (S.D.N.Y. Apr.18, 2000)(PKL), is misplaced. In that case, Judge Leisure accepted Magistrate Judge Ellis' recommendation that defendants' motion to preclude the trial testimony of plaintiffs' damages expert for failure to conduct an event study should be denied. *Id.* at *3. However, the court was careful to note that the expert had conducted a seventy-page "Event Analysis" that analyzed each company-specific event that could have influenced Sloan's stock price. Additionally, Sloan's "life as an operating company and the alleged fraud began at approximately the same time," making it impossible for plaintiffs' expert in that case to look to a meaningful price history for Sloan's stock as a control period for statistical analysis. Both of these factors, the court noted, distinguished *RMED* from cases such as *Executive Telecard* or *Oracle*. *Id.* at *6. In contrast, Torkelsen did not perform a rigorous analysis like the expert in *RMED*, and Nortel had an extensive stock market history that could have been used as a control period.

6. In addition to their failure to provide evidence of causation or injury, plaintiffs have failed to provide admissible evidence of any other element of the conference call claim. Plaintiffs do not dispute that they have no evidence of the transcript's authenticity. Nor have plaintiffs produced any evidence that the

defendants' expert concluded that neither of these alleged activities had any effect on Nortel's stock price. Accordingly, plaintiffs have failed to raise a disputed issue of fact as to the causation element of their accounting fraud and conference call misrepresentation claims.

## II. Scienter

Plaintiffs asserting claims under § 10(b) and Rule 10b–5 must show that defendants made misrepresentations or omissions with the "intent to deceive, manipulate, or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976). Because the 1934 Act "speaks so specifically in terms of manipulation and deception," proof of negligent conduct is insufficient to establish liability. *Id.* at 214, 96 S.Ct. at 1391.

Scienter can be proven in two ways. First, plaintiffs can show that defendants had "both motive and opportunity to commit fraud." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1128 (2d Cir. 1994). Second, plaintiffs can present "circumstantial evidence of conscious misbehavior or recklessness." *Id.* The Second Circuit has explained, however, that the distinction between these two means of proving scienter diminishes in importance when testing the sufficiency of plaintiff's evidence rather than the adequacy of allegations in a complaint. *AUSA Life Ins. Co. v. Ernst & Young,* 206 F.3d 202, 221 n. 12 (2d Cir.2000). On a motion for summary judgment, therefore, the issue is whether the evidence, taken as a whole, could support a finding by a reasonable juror that defendants acted with the intent to deceive, manipulate, or defraud investors.

Plaintiffs make little effort to show that defendants had motive to commit fraud. Indeed, the evidence shows unequivocally that defendants lacked any such motive. Plaintiffs instead assert that defendants consciously or recklessly made the representations at issue. Plaintiffs rely on numerous internal documents that

two sentences to which they point were ever

were in existence at the time the six statements were made. Plaintiffs claim that these documents brought to defendants' attention, or should have done so, that the statements at issue were false or misleading. The documents indicate that Nortel's switching systems were suffering quality problems; that customer relations were deteriorating; that Nortel's product quality was slipping behind its competition; that gross margins on switching products had decreased substantially; and that Nortel's inventory of high-margin products had been depleted and would remain depleted until the middle of 1993. Plaintiffs have established a triable issue of fact as to whether defendants had knowledge of these aspects of Nortel's business.

However, plaintiffs must still prove that the statements at issue were made recklessly or with intent to deceive. The evidence is insufficient to allow a reasonable juror to draw such a conclusion. First, there is no evidence of any "concrete benefits that could [have been] realized by one or more of the false statements and wrongful nondisclosures alleged." *Shields,* 25 F.3d at 1130. The company itself derived no benefit from the statements at issue. During the class period, Nortel did not sell shares of its stock, it did not issue a debenture or commence a rights offering, and it did not use its stock as acquisition currency. *Compare Time Warner,* 9 F.3d at 269–70 (withholding information to inflate a rights offering is sufficient motive to plead scienter). Nor did Nortel's majority shareholder, BCE, gain any benefit.

More significantly, the individual defendants had nothing to gain from making the alleged misrepresentations. They sold no shares during the class period. In fact, it is undisputed that they held or increased their holdings and lost $27.8 million collectively. The absence of stock sales by insiders, or any other evidence of pecuniary gain by company insiders at shareholders' expense, is inconsistent with an intent to defraud shareholders. *Kalnit v. Eichler,* 99 F.Supp.2d 327, 337 (S.D.N.Y. 2000). Even where company insiders sell

released to the public.

stock during the class period, scienter is not necessarily inferred. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 814 (2d Cir.1996) (holding that sales by one company executive during class period do not require an inference that the company possessed fraudulent intent where other executives sold no shares); *Acito v. IMC-ERA Group, Inc.*, 47 F.3d 47, 54 (2d Cir. 1995) (holding that even insider trading during a class period is insufficient to show scienter if the trading is not "unusual").

Additionally, no individual defendant could have benefitted from the alleged misrepresentations. Nortel's executives were compensated based on annual aggregate results as measured against the year's budget. Executive compensation did not depend on quarterly results.[7] The individual defendants thus had no reason to make the alleged misrepresentations or delay disclosure of material information during the class period.

To the contrary, Nortel's executives had a financial incentive *not* to engage in the alleged fraudulent scheme. A committee of Nortel's board set executive compensation. During the month before the class period began, Nortel's executives received approval from the board for a 1993 record budget. If these executives in fact believed that 1993 was to be a poor year, then they were acting contrary to their economic interest by forecasting a record year, since it would be more difficult to meet budgetary targets. Moreover, the board learned about management's second-quarter and year-end projections on the same day in June as did the public. Thus, if the individual defendants intended to mislead investors, they also intended to mislead their own board, contrary to their own economic interest. Such an inference cannot rationally be drawn from the evidence. Where "[p]laintiffs' view of the

facts defies economic reason ... it does not yield a reasonable inference of fraudulent intent." *Atlantic Gypsum Co. v. Lloyds Int'l Corp.*, 753 F.Supp. 505, 514 (S.D.N.Y.1990); *see Shields*, 25 F.3d at 1130 ("we assume that the defendant is acting in his or her informed economic self-interest") (citing *Atlantic Gypsum*); *cf. Matsushita Elec. Ind. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 596–97, 106 S.Ct. 1348, 1361–62, 89 L.Ed.2d 538 (1986) ("[A]s presumably rational businesses, petitioners had every incentive not to engage in the conduct with which they are charged, for its likely effect would be to generate losses for petitioners with no corresponding gains.... Lack of motive bears on the range of permissible conclusions that might be drawn from ambiguous evidence: if petitioners had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy.")

Plaintiffs allege (and their damages expert assumes) that certain disclosures made by defendants should have been made earlier. However, it is undisputed that in March, June, and July of 1993, the public was informed of negative forecasts or significant corporate decisions immediately after the board considered and approved them. Moreover, as shown in Part I, *supra*, it is undisputed that defendants released negative information for both the first and second quarters voluntarily and earlier than required by SEC rules. "It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning." *Shields*, 25 F.3d at 1130.

In a footnote, plaintiffs attempt to establish that defendants had a motive to commit fraud. They argue that defendants wanted to maintain the impression of Nortel as a thriving company, to reassure Nortel's customers, and to protect their

---

7. In any event, the existence of incentive compensation for executives has been held to be insufficient to prove intent. *Novak v. Kasaks*, 216 F.3d 300, 307–08 (2d Cir.2000) (intent cannot be based on "motives possessed by virtually all corporate insiders").

positions with the company. (Pl. Mem. at 4 n. 5.) However, all of these motives have been rejected as proof of intent to mislead. *See Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 169 (2d Cir.2000) ("General allegations that the defendants acted in their economic self-interest are not enough."); *Shields*, 25 F.3d at 1130 (allegation that "executives aim to prolong the benefits of the positions they hold" held insufficient); *Novak v. Kasaks*, 216 F.3d 300, 307 (2d Cir.2000) (interests in maintaining a high corporate credit rating, sustaining the appearance of profitability, and maintaining a high stock price to increase executive compensation held insufficient); *In re Crystal Brands Securities Litig.*, 862 F.Supp. 745, 749 (D.Conn.1994) (interest in maintaining good relations with suppliers, retailers, and lenders held insufficient) (cited with approval in *Chill v. General Elec. Co.*, 101 F.3d 263, 268 (2d Cir.1996)); *In re Oxford Health Plans, Inc. Securities Litig.*, 51 F.Supp.2d 290, 294 (S.D.N.Y.1999) ("generalized economic interests" in protecting and enhancing fees received from customers, increasing market share, and increasing income held insufficient).

With respect to Statements Two, Five, and Six, "the public statements accurately reflected [the company's] internal forecasts at the time" and thus were not made with scienter. *Levine v. NL Inds., Inc.*, 720 F.Supp. 305, 308 (S.D.N.Y.1989), *aff'd*, 926 F.2d 199 (2d Cir.1991). Nortel's budget, the April View, and management's slide presentation to the board were all internal Nortel documents that consolidated the company's information and views and predicted a record year. The slide presentation was on April 29, after the last of the six challenged statements was made. *See In re 1993 Corning Securities Litig.*, No. 93 Civ. 7015, 1996 WL 257603, at *8 (S.D.N.Y. May 15, 1996) (holding that disclosure of earnings projections on the same day they are disclosed to the board of directors, absent evidence of intentional delay in reporting to the board, negates fraudulent intent). Plaintiffs do not dispute that these consolidated documents contained optimistic predictions, but rather argue that the predictions were not accurate. This is insufficient evidence that defendants acted with intent to defraud. *See In re Symbol Techs. Class Action Litig.*, 950 F.Supp. 1237, 1246 (E.D.N.Y.1997) ("The evidence shows, at most, that Symbol's senior management relied on internal forecasts that turned out, in hindsight, to be inaccurate. This is not fraud.").

Statements One, Two, Three, and Four were buried in the middle of longer, substantive texts. Scienter depends in part on "the likely prospect of achieving concrete benefits by the means alleged." *Shields*, 25 F.3d at 1130. The requisite intent exists only "[w]hen it is clear that a scheme, viewed broadly, is necessarily going to injure." *AUSA Life*, 206 F.3d at 220–21 (quoting *United States v. Chacko*, 169 F.3d 140, 148 (2d Cir.1999)). No reasonable juror could conclude that defendants believed that these four excerpts were likely to mislead the public.

Plaintiffs argue that even if the statements were not willfully misleading, they were nonetheless made recklessly. "Reckless conduct is, at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978) (quoting *Sanders v. John Nuveen & Co.*, 554 F.2d 790, 793 (7th Cir.1977)). Representations have been found reckless when they are made "conclusorily" and "without investigation and with utter disregard for whether there was a basis for the assertions," *id.* at 47–48; where defendants "failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud," *Novak*, 216 F.3d at 308; or where defendants exhibited "[a]n egregious refusal to see the obvious, or to investigate the doubtful." *Chill*, 101 F.3d at 269 (quoting *Goldman v. McMahan, Brafman, Morgan*

*& Co.,* 706 F.Supp. 256, 259 (S.D.N.Y. 1989)). To show recklessness, plaintiffs must also show that defendants had a "motive for deliberately shutting their eyes to the facts." *In re Fischbach Corp. Securities Litig.,* No. 89 Civ. 5826, 1992 WL 8715, at *7 (S.D.N.Y. Jan. 15, 1992). Poor business judgment is not enough. *Rothman v. Gregor,* 220 F.3d 81, 90 (2d Cir. 2000).

 Plaintiffs have not shown that any of the six statements were made recklessly. As discussed above, plaintiffs have not shown that defendants had any motivation to "deliberately shut their eyes to the facts." Moreover, management's April View assessment and board presentation in late April, along with the timing of the eventual disclosures, demonstrates that defendants were not attempting to remain willfully blind to the company's "true" state of affairs but rather were performing a regular assessment which they had every incentive to make accurate. The existence of documents raising concerns about the company's business does not show that a positive outlook is reckless when revealed to be inaccurate in hindsight. *See In re Carter–Wallace, Inc. Securities Litig.,* 220 F.3d 36, 40–42 (2d Cir.2000) (dismissing allegations that defendants "turned a blind eye" to reports of adverse side effects of company's drug); *Chill,* 101 F.3d at 268–71 (dismissing allegations that defendant failed to heed "red warning flags" that signaled defendant's subsidiary's falsification of profits); *see generally Shields,* 25 F.3d at 1129 ("[M]isguided optimism is not a cause of action, and does not support an inference of fraud. We have rejected the legitimacy of 'alleging fraud by hindsight.'") (quoting *Denny v. Barber,* 576 F.2d 465, 470 (2d Cir.1978)).

 Finally, plaintiffs have not proven the scienter element of their accounting fraud claim. "Allegations of a violation of GAAP provisions or SEC regulations, without corresponding fraudulent intent, are not sufficient to state a securities fraud claim." *Chill,* 101 F.3d at 270. There is no evidence that Nortel's use of "pull-in" sales was inherently fraudulent or deceptive. *See Eisenstadt v. Allen,* No. 95–16255, 1997 WL 211313, at *9–10 (9th Cir. Apr. 28, 1997).

In sum, plaintiffs have failed to provide evidence from which a reasonable juror could conclude that defendants acted recklessly or with the intent to mislead or defraud the public. Accordingly, plaintiffs cannot establish this essential element of their claims.

### III. Misrepresentations of Material Fact

 Plaintiffs must prove that defendants made "false statement[s] or omission[s] of material fact." *IBM,* 163 F.3d at 106. When viewed in their surrounding context and in light of the lack of interest of the financial community, all of the statements at issue are either immaterial, cautionary, or have a reasonable basis in fact.[8] A statement is material if there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic,* 485 U.S. at 231–32, 108 S.Ct. at 983 (quoting *TSC Indus., Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)).

 Statements One and Two are similar and can be considered together. Statement One reads, "Our product lines have never been stronger—nor more diverse."

8. Plaintiffs make much of the fact that I held these six statements to be actionable on a motion to dismiss earlier in the case. *See In re Northern Telecom Ltd. Securities Litig.,* No. 93 Civ. 4384, 1994 WL 455534, at *7 (S.D.N.Y. Aug. 22, 1994). However, the statements survived the motion to dismiss only under the lenient Fed.R.Civ.P. 12(b)(6) standard that a complaint may be dismissed "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *I. Meyer Pincus & Associates, P.C. v. Oppenheimer & Co., Inc.,* 936 F.2d 759, 762 (2d Cir.1991). Plaintiffs have a heavier burden when opposing a motion for summary judgment.

The statement is included in the middle of a seven-page news release announcing record orders, revenues, and earnings for 1992 and setting forth consolidated data for Nortel's previous two fiscal years. Statement Two is identified in the complaint as "we will continue to deliver the best of new technologies ..." The complete statement reads, "At the same time, we will continue to deliver the best of new technologies that will allow telecommunications companies to offer their customers the exciting new narrowband, wideband and broadband services of the future." Statement Two is included in the middle of a four-page news release announcing changes to Nortel's marketing and sales organization.

Neither of these statements is sufficiently "concrete" or "specific" to be material. *IBM*, 163 F.3d at 110. They are "single, vague statement[s]" that are essentially mere "puffery." *San Leandro*, 75 F.3d at 810–11. Their placement in their respective news releases is inconspicuous. It is undisputed that the major business press paid no attention to either statement. Finally, both statements are "qualified by the context of the rest of the paragraph[s]" in which they are found. *Id.* Thus, no reasonable investor could have read either of these statements as altering the "total mix" of available information, especially since they were included in news releases containing much more specific, concrete, and significant information.

Statements Three and Four appear in Nortel's fifty-six page 1992 annual report. Statement Three reads, "Northern Telecom has been cementing relationships with telephone companies through long-term contracts for network upgrades." The report goes on to describe a number of contracts for network upgrades with Ameritech, Pacific Bell, U.S. West, Southwestern Bell, and Rochester Telephone. It is undisputed that all of these contracts were made. Viewed in context, Statement Three is thus accurate.

Plaintiffs contend that Statement Three is false despite the truth of its adjoining context because Nortel's customers were losing faith in the company and complaining more frequently. However, these allegations, even if true, do not make Statement Three inaccurate. The statement did not represent that Nortel had no problems with its customers, or even that Nortel was cementing relationships with all of its customers. Rather, it asserted that Nortel was cementing relationships with some telephone companies, and the truth of the supporting examples is undisputed. Moreover, the major business press did not report Statement Three. Statement Three is thus not a misrepresentation of material fact.

Statement Four, also found in the 1992 annual report, reads, "The company's first major European investment—the acquisition of STC PLC in the United Kingdom—is already yielding significant benefits." The report goes on to describe a large underseas fiber optic cable contract, network and switching contracts for BT, and private network awards with two money center banks. Plaintiffs do not dispute the truth of these assertions.

Rather, plaintiffs argue that the representation that STC was "already yielding significant benefits" could only be understood to mean that STC was profitable. However, the only evidence plaintiffs cite on this point consists of statements made after the date of Statement Four. For example, plaintiffs cite a later statement by Monty that the STC acquisition had never "brought the benefits that were anticipated" and referring to a "lack of profitability" in Nortel's European operations which was "causing [Nortel] to reassess the level of goodwill related to the STC acquisition." (PX 53 at NT17803.)

Plaintiffs have not shown that Statement Four was a misrepresentation of material fact. Plaintiffs cite no evidence showing that Statement Four did not have a "basis in fact" when it was made. *IBM*, 163 F.3d at 109. Moreover, the statement did not represent that STC was generally successful or profitable. It only stated that STC

was "yielding significant benefits," and plaintiffs do not contest the truth of the examples that follow the statement. Finally, the major financial press did not report on the statement.

Statements Five and Six are both forward-looking statements and can be considered together. Statement Five reads, "In addition, our record backlog from 1992 supports our cautiously optimistic view that 1993 will be a year of good performance." The statement was by Monty and appeared in a news release reporting a likely earnings shortfall for the first quarter of 1993 and in which Monty was quoted as stating that "we are not satisfied with expected first quarter results." Statement Six reads, "In North America, expected good access line growth combined with the improving economy and a strong order backlog suggest a quarterly financial profile similar to 1992." The statement appeared in a news release reporting first quarter results. Plaintiffs claim that these statements lacked a reasonable basis because Nortel's customer and product problems were sufficiently severe that defendants knew that 1993 would not be a year of good performance and that the second quarter of 1993 would not resemble the second quarter of 1992.

Plaintiffs' argument is without merit. Plaintiffs are correct insofar as Statements Five and Six, in hindsight, turned out to be incorrect. However, this is not the end of the inquiry. First, the statements are "expression[s] of optimism that [are] too indefinite to be actionable under the securities laws." *IBM*, 163 F.3d at 108; *see also San Leandro*, 75 F.3d at 807, 811 (statement that "[w]e expect 1993 to mark another year of strong growth in earnings per share" is "puffery" that "cannot have misled a reasonable investor ..."); *id.* at 806 (statement that "[B]ased on our growth and productivity initiatives, increasing volume momentum, and a narrowing of price gaps in a number of our key categories, we are optimistic about 1993" held not material).

Second, neither Statement Five nor Statement Six is a "long term guarantee or assurance." *IBM*, 163 F.3d at 108. With respect to Statement Five in particular, the majority of the news release containing the statement was negative and, "considered in [its] entirety, clearly 'bespeak[s] caution.'" *San Leandro*, 75 F.3d at 811 (quoting *Goldman v. Belden*, 754 F.2d 1059, 1068 (2d Cir.1985)). Indeed, it is undisputed that Nortel's stock price dropped substantially after the news release containing Statement Five was issued.

Third, forward-looking statements of opinion or belief like Statements Five and Six are not actionable if they have a "basis in fact" and are "genuinely and reasonably believe[d]" by the speaker. *IBM*, 163 F.3d at 109. As discussed in Part II, *supra*, both statements were consistent with Nortel's internal, unpublished projections which forecast a record year for 1993. Plaintiffs cite numerous pieces of evidence that they claim should have put defendants on notice that optimistic predictions for 1993 were foolhardy, such as slowed order growth, saturation in the switching market, and a decrease in gross margins. However, forward-looking statements need not be accurate in hindsight to avoid liability under the securities laws. Plaintiffs do not challenge Nortel's internal forecasts except to allege that they were faulty. Even if the forecasts were incorrect, which defendants appear to concede they were, there is no evidence that Statements Five and Six were not honestly believed or lacked bases in fact.

Nor have plaintiffs produced evidence that the sentences quoted in the purported April 27, 1993 conference call transcript were material misrepresentations. The sentences appear on page sixteen of a twenty-seven page transcript. They follow a refusal to make a forecast concerning 1993 software sales and are buried within a discussion of Nortel's efforts to improve its software. Plaintiffs themselves cite a Goldman Sachs report on the conference

call stating that the call "did not contain any significant new information." (Pl.Ex. S.) No reasonable investor could conclude that these two sentences significantly altered the total mix of available information on Nortel.

Finally, plaintiffs have produced no evidence showing that the 1992 revenue recognition policies that they challenge were material to a quarterly or yearly accounting period. Without such evidence, an essential element is missing from plaintiffs' accounting fraud claim. *See Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 116 (2d Cir.1982).

## CONCLUSION

Plaintiffs have provided insufficient evidence that defendants committed securities fraud. Specifically, they have failed to produce sufficient evidence to allow a reasonable juror to conclude that the alleged misrepresentations were material, were made with scienter, or were the proximate cause of their loss. Accordingly, defendants' motion for summary judgment is granted and the action is dismissed.

SO ORDERED.