### In re: RECOTON CORPORATION SECURITIES LITIGATION

No. 6:03–CV–734–ORL–28KRS, 6:03–CV–836–ORL–28KRS, 6:03–CV–861–ORL–28KRS, 6:03–CV–884–ORL–28KRS, 6:03–CV–862–ORL–28KRS, 6:03–CV–946–ORL–28KRS.

United States District Court,
M.D. Florida,
Orlando Division.

Feb. 23, 2005.

Aaron Brody, Tzivia Brody, Stull, Stull & Brody, New York, NY, Kenneth Vianale, Vianale & Vianale LLP, Boca Raton, FL, Mel E. Lifshitz, Joseph R. Seidman, Jr., Bernstein Liebhard & Lifshitz, LLP, New York, NY, Robert S. Schachter, Kevin M. McGee, Sona R. Shah, Zwerling, Schachter & Zwerling LLP, New York, NY, Douglas Clark Bowdoin, Beusse, Brownlee, Bowdoin & Wolter, P.A., Orlando, FL, William S. Lerach, Darren J. Robbins, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, San Diego, CA, Nadeem Faruqi, Faruqi & Faruqi, LLP, New York, NY, Maya Saxena, Milberg, Weiss, Bershad, Hynes & Lerach, Boca Raton, FL, Marc A. Topaz, Richard A. Maniskas, Schiffrin & Barroway, LLC, Bala Cynwyd, PA, Paul J. Geller, Jack E. Reise, Cauley, Geller, Bowman & Rudman, LLP, Boca Raton, FL, Samuel H. Rudman, David A. Rosenfeld, Cauley Geller Bowman & Rudman LLP, Melville, NY, Gregory Mark Nespole, Michael J. Miske, Wolf, Haldenstein, Adler, Freeman & Herz, New York, NY, Marc S. Henzel, Law Offices of Marc S. Henzel, Bala Cynwyd, PA, Chris A. Barker, Barker, Rodems & Cook, Tampa, FL, Ralph M. Stone, Thomas G. Ciarlone, Jr., Lee Shalov, Shalov Stone & Bonner, LLP, New York, NY, for Plaintiffs.

J. Allen Maines, Albert M. Myers (argued), Alison Danaceau, Carl W. Mullis, Paul, Hastings, Janofsky & Walker LLP, Atlanta, GA, Jeffrey W. Davis, Michael J. Dell, Timothy P. Harkness, Kramer Levin Naftalis & Frankel, LLP, New York, NY, Mayanne Downs, King, Blackwell & Downs, Orlando, FL, for Defendants.

## ORDER

ANTOON, District Judge.

This case is a putative securities fraud class action in which shareholders seek relief against individual corporate officers and directors of Recoton Corporation

("Recoton" or "the Company") and Recoton's outside auditor, Deloitte & Touche ("D & T"). The case is currently before the Court on motions filed by the Individual Defendants (Doc. 90) and D & T (Doc. 94) seeking dismissal of the Consolidated Amended Class Action Complaint ("the Complaint") (Doc. 76). As more specifically set forth below, the Complaint fails to adequately plead fraud under the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Federal Rule of Civil Procedure 9(b) as to certain claims and fails to plead loss causation under the Securities Exchange Act as to all claims. Accordingly, the respective motions to dismiss are granted. Plaintiffs will be granted an opportunity to amend.

## I. FACTS

### A. Introduction

This securities fraud case is brought on behalf of purchasers of Recoton common stock from November 15, 1999 through August 19, 2002 ("the Class Period"). Plaintiffs bring this action against D & T, the accounting firm allegedly hired as Recoton's outside auditor, as well as the following individuals (collectively, "Individual Defendants"), who are alleged to have held the following respective positions: Arnold Kezsbom, Executive Vice President, Vice Treasurer, Chief Financial Officer, and Director; Robert L. Borchardt, President, Chief Executive Officer, Chairman, and Director; Stuart Mont, Chief Operating Officer, Executive Vice President, and Director; and Tracy Clark, Chief Accounting Officer.

In the First and Second Counts of the Complaint, Plaintiffs allege that all Defendants violated § 10(b) of the Securities

Exchange Act of 1934 ("the Exchange Act") and Rule 10b–5 promulgated thereunder. In the Third Count, Plaintiffs aver that the Individual Defendants acted as controlling persons of Recoton within the meaning of Section 20(a) of the Exchange Act.

### B. Background

For the purposes of these motions to dismiss, the well-pleaded facts as alleged by the Plaintiffs in the Complaint are taken as true.[1] Recoton, formed in 1936 as a manufacturer of phonograph needles, expanded its offerings over time to become a marketer and producer of a vast array of consumer electronic products. (Compl.¶¶ 13, 14.) Formerly headquartered in Lake Mary, Florida, Recoton employed over four thousand employees and its common stock was traded on the NASDAQ under the ticker symbol "RCOT." (Compl.¶ 13.) The Company was comprised of three principal business segments: (i) audio equipment; (ii) consumer electronics accessories; and (iii) video and computer games. (Compl.¶ 17.) The video and computer games division, InterAct International, Inc. ("InterAct"), is the subject of three of Plaintiffs' eight substantive allegations.[2] InterAct accounted for approximately twenty-nine percent of Recoton's net sales.[3]

On September 9, 1999, Recoton filed a Form 8–K, stating that the Company entered into an agreement to restructure its existing indebtedness by granting lenders collateral in substantially all of the Company's assets, an arrangement commonly called "asset-backed financing." The agreement provided Recoton with an additional credit facility of $50 million. (Compl.¶ 18.) On the first day of the Class Period, November 15, 1999, Recoton stock

---

**1.** *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1198 n. 2 (11th Cir.2001).

**2.** *See* Part III(A)(i)(iv)(v).

**3.** According to a December 31, 2001 Form 10–K, the approximate percentage of Reco-

ton's revenues from total net sales attributable to the video and computer games division was 33% in 1999, 27% in 2000, and 26% in 2001. (Compl.¶¶ 28–29.)

traded at $6.25. (Compl.¶ 27.) On the same day, Recoton filed a Form 10–Q stating that it had implemented "a strategic business plan designed to improve operating efficiencies, increase future profitability, improve cash flow and increase return on assets." (Compl.¶ 22.) Recoton stated, in its 1999 Form 10–K, that $1.1 million had been spent on InterAct in connection with the Strategic Plan. (Compl.¶ 54.) The Company also assured, in Forms 10–K for 1999, 2000, and 2001, that inventories were accounted for "at the lower of cost or market" and, in Forms 10–K for 1999 and 2000, that inventories were "closely controlled." (Compl.¶¶ 34–35.) By February 23, 2000, the price of Recoton stock had more than doubled, posting a price of $14.43, and the Company's stock reached a Class Period high of $21.00 on July 26, 2001. (Compl.¶ 27.)

Recoton's Forms 10–K and 10–Q from December of 1999 through June of 2001 stated declines in net sales at InterAct. The statements attributed the decline to such factors as competitive pricing measures, the transition phase of the video game business, air freight, the introduction of new gaming platforms, and increased competition. (Compl.¶¶ 49–50.)

On July 25, 2002, Recoton hosted a closed-door, private presentation to its lenders. At that meeting, Recoton disclosed a number of "Critical Viability Issues" at InterAct. The issues included: i) STD, a supplier of InterAct, functioned as "an inefficient, high cost producer, which could not supply the product range at competitive prices;" ii) "excessive overhead;" iii) "excessive price protection (mark-down allowances given to retailers);" iv) "excessive defective product returns;" v) "losses speculating with new product introductions;" vi) "poor and unstable management;" and vii) "excess and slow moving inventory" amounting to at least $60,543,000, $51,093,000, and $50,246,000,

at December 31, 2000, December 31, 2001, and June 30, 2002, respectively. Additionally, a written internal Company forecast associated with the presentation assumed that the Company's excess and obsolete inventory, which had been carried at a book value of $7 million, as of June 30, 2002, could be sold at most for $4 million. (Compl.¶¶ 39, 34(iv).)

On August 19, 2002, the last day of the Class Period, Recoton stock closed at $2.08. (Compl.¶ 27.) On the same day, the Company stated in its Form 10–Q that, in connection with a restructuring plan to align the video and computer game segment, it recorded a second quarter loss of approximately $20.6 million incurred as follows: i) inventory write-downs. $12.8 million; ii) revaluation of assets, $4.7 million; iii) employee severance, $0.9 million; iv) forgiveness of officers' receivables, $0.9 million; and v) customer concessions, $1.3 million. (Compl.¶ 37i.) On November 18, 2002, the Company's Form 10–Q reported a third quarter loss of $43,525,000, of which $36,684,000 came from InterAct. Most of the InterAct loss came from "inventory impairment" ($25,578,000). (Compl.¶ 37ii.) In April of 2003, Recoton filed for bankruptcy.

### C. Summary of Cause of Action

Plaintiffs' 95–page Complaint contains 172 separate paragraphs, some of which duplicate the allegations contained in others. Plaintiffs allege that the asset-backed financing arrangement entered into immediately before the beginning of the Class Period motivated Defendants to stockpile obsolete inventory and artificially inflate accounts receivable and revenues. Plaintiffs further allege that the Company misled investors by attributing its financial decline to industry-wide factors instead of the "Critical Viability Issues" disclosed at the July 2002 lender presentation. Such issues, Plaintiffs contend, were present and known to Defen-

dants throughout the Class Period. Plaintiffs also allege that Defendants misled investors into believing that $1.1 million had been invested into restructuring InterAct in 1999 when such a plan was not executed until late in the first quarter of 2002. Plaintiffs further allege that Defendants participated in misleading company statements regarding retention of Recoton customers and executive compensation. Finally, Plaintiffs allege that D & T misled investors by issuing materially false audit opinions about Recoton.

## II. PLEADING STANDARDS

### A. Motion to Dismiss Standard

For the purpose of a motion to dismiss, a complaint is construed in the light most favorable to the plaintiff, and all facts alleged by the plaintiff are accepted as true. *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984); *Ziemba v. Cascade Int'l, Inc.,* 256 F.3d 1194, 1198 n. 2 (11th Cir.2001). In a securities fraud case, when deciding a motion to dismiss, the court "may take judicial notice (for the purpose of determining what statements the documents contain and not to prove the truth of the documents' contents) of relevant public documents required to be filed with the SEC, and actually filed." *Bryant v. Avado Brands, Inc.,* 187 F.3d 1271, 1278 (11th Cir.1999).

### B. The Securities Exchange Act of 1934

In the Complaint's First and Second Counts, Plaintiffs allege that Defendants violated Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and 17 C.F.R. § 240.10b–5 (hereinafter "Rule 10b–5"). Under Section 10(b), it is "unlawful for any person, directly or indirectly ... [t]o use or employ, in connection with the purchase or sale of any security ... any manipulative or deceptive device or contrivance in contravention of [SEC] rules and regulations." 15 U.S.C. § 78j(b). Rule 10b–5, which implements § 10(b), in turn provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme, or artifice to defraud,
>
> (b) To make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

■ Plaintiffs' Complaint is based on material misrepresentations and omissions made by Defendants pursuant to subparagraph (b) of Rule 10b–5.[4] It is well-settled that "[t]o allege securities fraud under Rule 10b–5, a plaintiff must show: 1) a

---

**4.** Plaintiffs allege, in their Second Count, that liability also arises under subparagraphs (a) and (c) of Rule 10b–5. However, Plaintiffs base their claims on alleged misrepresentations and omissions and make no attempt to cast the claims in terms of market manipulation pursuant to Rule 10b–5(a) and (c). As stated by the Second Circuit, "where the sole basis for [Rule 10b–5 claims] is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b–5(a) and (c)." *Lentell v. Merrill Lynch & Co., Inc.,* 396 F.3d 161, 177 (2nd Cir.2005) (citing *Schnell v. Conseco, Inc.,* 43 F.Supp.2d 438, 447–48 (S.D.N.Y.1999) (refusing to characterize allegations as market manipulation claims where alleged "schemes to defraud" consisted largely of an aggregation of material · misrepresentations)). As such,

misstatement or omission, 2) of material fact, 3) made with scienter, 4) on which plaintiff relied, 5) that proximately caused his injury." *Bryant,* 187 F.3d at 1281 (citing *Ross v. Bank South, N.A.,* 885 F.2d 723, 728 (11th Cir.1989) (en banc)).

Plaintiffs bring their Third Count— against the Individual Defendants only— under Section 20(a) of the Exchange Act (15 U.S.C. § 78t(a)), which provides for joint and several liability of "controlling persons" liable for a securities violation. This section provides in full:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).

A "controlling person" has been defined in the Eleventh Circuit as a person who " 'had the power to control the general affairs of the entity primarily liable at the time the entity violated the securities laws ... [and] had the requisite power to directly or indirectly control or influence the specific corporate policy which resulted in the primary liability.' " *Brown v. Enstar Group, Inc.,* 84 F.3d 393, 396 (11th Cir. 1996) (quoting *Brown v. Mendel,* 864 F.Supp. 1138, 1145 (M.D.Ala.1994)).

---

Plaintiffs' claims are solely addressed under Rule 10b–5(b).

**5.** Section 78u–4(b)(1) states:

In any private action arising under this title in which the plaintiff alleges that the defendant—
(A) made an untrue statement of a material fact; or

## C. *Federal Rule of Civil Procedure 9(b)*

█ In order to survive a motion to dismiss, Plaintiffs' claim of fraud under Rule 10b–5 must also satisfy the requirements of Federal Rule of Civil Procedure 9(b) ("Rule 9(b)"), which requires that the "circumstances constituting fraud ... be stated with particularity." *See, e.g., Gross v. Medaphis Corp.,* 977 F.Supp. 1463, 1470 (N.D.Ga.1997). Rule 9(b)'s fraud particularity requirement "is satisfied if the complaint sets forth '(1) precisely what documents or oral representations were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud.' " *Ziemba,* 256 F.3d at 1202 (quoting *Brooks v. Blue Cross & Blue Shield of Fla., Inc.,* 116 F.3d 1364, 1371 (11th Cir. 1997)).

## D. *Heightened Pleading Requirements under the PSLRA*

█ In addition to the pleading requirements of Rule 9(b), the PSLRA, Pub.L. No. 194–67, 109 Stat. 743, codified at 15 U.S.C. § 78u–4(b), imposes heightened pleading burdens on plaintiffs in private securities actions such as the case at bar. The PSLRA requires that a complaint contain: (1) factual specificity as to the alleged misleading or omitted statements [5] and (2) particular facts raising a

---

(B) omitted to state a material fact in order to make the statements made, in the light of the circumstances in which they were made, not misleading:
the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with

"strong inference" that a defendant acted with "the required state of mind."[6] The Eleventh Circuit has held that scienter is satisfied by a showing that the defendant had "an intent to deceive manipulate or defraud" or that the defendant "acted with a severely reckless state of mind." *Bryant,* 187 F.3d at 1282–83. Severe recklessness is "'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it.'" *Id.* at 1282 n. 18 (quoting *McDonald v. Alan Bush Brokerage Co.,* 863 F.2d 809, 814 (11th Cir.1989)). While averments of motive and opportunity to commit fraud "may be relevant to a showing of severe recklessness ... such allegations, without more, are not sufficient to demonstrate the requisite scienter." *Id.* at 1285. Further, the Eleventh Circuit has recently clarified that "scienter must be found with respect to each defendant and with respect to each alleged violation of the statute." *Phillips v. Scientific–Atlanta, Inc.,* 374 F.3d 1015, 1018 (11th Cir. 2004).

## III. ANALYSIS OF THE ALLEGATIONS

Part A of this analysis addresses whether each substantive allegation pleads

particularity all facts on which that belief is formed.

6. Section 78u–4(b)(2), Required State of Mind, states:

In any private action arising under this title in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to have violated this title, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

fraud with sufficient particularity under Rule 9(b) and 15 U.S.C. § 78u–4(b)(1). Part B considers whether any remaining allegations give rise to a strong inference of scienter with regard to each Individual Defendant under 15 U.S.C. § 78u–4(b)(2). Part C addresses whether Plaintiffs have adequately pled loss causation.

### A. Pleading Fraud with Particularity

It is clear that "Congress intended courts to take seriously the requirement that a plaintiff plead with particularity all facts upon which the plaintiff is basing the information and beliefs contained in the plaintiff's allegations." *Malin v. Ivax Corp.,* 17 F.Supp.2d 1345, 1360 (S.D.Fla. 1998). Plaintiffs allege eight independent and substantive bases for their fraud claims. These eight allegations are examined separately to determine whether Plaintiffs have met the particularity requirements of Rule 9(b) and the PSLRA.

### i) Inflated Inventory

Plaintiffs allege that Recoton maintained an inflated, obsolete inventory for the purpose of creating increased borrowing potential against such inventory. (Compl. ¶ 19.) Plaintiffs contend that Recoton materially misrepresented itself by saying it would: (1) state inventories at the lower of cost or market;[7] (2) write down inventory for obsolescence;[8] and (3) closely control

7. Recoton's Form 10–K for December 31, 2001, stated: "The Company's merchandise inventory is carried *at the lower of cast or market* on a first-in, first-out basis." (Compl. ¶ 34(i) (emphasis added).

8. Recoton's Form 10–K for December 31, 2001, stated: "The Company *writes down inventory for estimated obsolescence or unmarketable inventory* equal to the difference between the cost of inventory and the estimated market value based upon assumptions about future demand and market conditions." (Compl.¶ 34(i)) (emphasis added).

inventory.[9, 10]

Plaintiffs attempt to show that Defendants willfully failed to write down obsolete inventory by relying on an August 19, 2002 Form 10–Q recording a $12.8 million loss due to "inventory write-downs" and a November 18, 2002 Form 10–Q recording a $30.893 million loss due to "inventory impairment." These two recorded losses, Plaintiffs contend, amount to an approximate $43.7 million loss attributed to inventory write-downs. Additionally, Plaintiffs allege that at the July 25, 2002, closed-door lender presentation, the Company disclosed that InterAct had accumulated excess and slow moving inventory amounting to: $60,543,000 in December 31, 2000; $51,093,000 in December 31, 2001; and $50,246,000 in June 30, 2002. Associated with the same lender presentation, an internal, written Recoton forecast stated that the Company's excess and obsolete inventory, which had been carried at a book value of $7 million, as of June 30, 2002, could be sold at most for $4 million, resulting in a $3 million (or 42.85%) loss. Thus, as a result of these figures, Plaintiffs contend that write-down losses were not being accounted for during the Class Period at the lower of cost or market and in violation of "generally accepted accounting principles" ("GAAP").[11]

Plaintiffs further rely on statements from various anonymous employees, one anonymous "company insider," and George Calvi, a Recoton director from 1982 to 2003, for the claim that Recoton was stockpiling obsolete inventory. The following is an excerpt from Calvi's testimony:

> I believe that ... greatly increased inventory figures were used in order to obtain the refinancing that Recoton was seeking. Contrary to its assertion in its public filings that the inventory increases amounted merely to "stocking up" in anticipation of high demand, the company's video game inventory was becoming obsolete and would not be able to be sold since it would not be compatible with new videogame technology that would be coming onto the market. Ultimately, by entering into the refinancing, Recoton increased its debt from approximately $180 million, a substantial amount of which was unsecured, to approximately $230 million, which was not only secured but asset-backed as well. In addition to overvaluing its inventory, Recoton furnished its lenders with inflated projections for its income and profits. In 1999, I questioned Recoton's Chairman and CEO, Robert Borchardt, and its CFO, Amold Kezsbom, about the accuracy of the projections and the in-

---

9. Recoton's Forms 10–K for December 31, 1999, and December 31, 2000 stated: "Consistent with the needs to supply products to its customers, *inventories are closely controlled* and maintained at levels related to product cycles and responsive to normal delivery." (Compl.¶¶ 34iv, 35) (emphasis added).

10. In addition to these misrepresentations, Defendants allege six omissions which are deemed inseparable from the above-mentioned misrepresentations and which are given the same consideration. *See* Compl. ¶ 39.

11. GAAP comprise a set of basic accounting principles pertaining to business entities that are approved by the Financial Accounting Standards Board of the American Institute of

Certified Public Accountants ("AICPA"). The principles establish guidelines for measuring, recording, and classifying a business entity's transactions. *See Ziemba*, 256 F.3d at 1200 n. 3. Plaintiffs cite Accounting Research Bulletin No. 43 for the proposition that where there is evidence that the utility of goods has changed in price due to obsolescence, "the difference should be recognized as a loss of the current period." Such a recognition is accomplished by stating the goods at a lower level commonly designated as market. Thus, Plaintiffs allege that Recoton's failure to account for excess and obsolete losses during the respective periods meant that the Company did not properly designate the goods at market, thereby violating GAAP. (Compl.¶ 37(vii).)

ventory valuation figures included in the reports provided to lenders with respect to the company's gaming division. Borchardt and Kezsbom assured me that the figures were accurate. I later learned that the figures were not accurate.

(Compl.¶ 141(ix).)

■ Plaintiffs' allegation of inventory fraud at InterAct meets the pleading requirements of Rule 9(b) and 15 U.S.C. § 78u–4(b)(1). The Complaint sets forth in detail the statements alleged to be false, when the statements were made, who made the statements, why the statements were false, and what the Defendants stood to gain in making the statements. *See In re Sunbeam*, 89 F.Supp.2d 1326, 1338 (S.D.Fla.1999). As substantiated by Calvi, Plaintiffs allege that Defendants artificially inflated inventory numbers for the sake of retaining and increasing financing from lenders. Whether Plaintiffs have satisfactory pled a strong inference of scienter with respect to each Defendant is addressed in Part III(B), infra.

ii) Inflated Accounts Receivable

Plaintiffs allege that Recoton made a material omission concerning the Company's purposeful delay in processing credits which resulted in an overstatement of accounts receivable. (Compl.¶¶ 21, 46(iv).) Defendant Kezsbom allegedly instructed a Recoton finance executive to delay recognizing a portion of customer returns, credits, and other deductions on sales throughout fiscal year 2002. According to the Recoton executive, the directive applied to returns and credits for all of Recoton's customers and divisions, yielding a $3 to $4 million overstatement of accounts receiv-

able in each quarter of 2002, which in turn caused an overstatement of available cash for each quarter of 2002. A different Recoton executive stated that the 2002 third quarter internally-reported return numbers coming out of the Finance Department for his division were lower than he expected. The same witness stated that he had learned that Kezsbom had instructed the credit manager on how much in returns could be booked for each quarter. Plaintiffs further allege that Kezsbom had an opportunity to disclose the alleged omission during a May 9, 2002 conference call with an analyst. When Kezsbom was asked to comment on the accounts receivable number for the first quarter (which Plaintiffs allege was $30 million larger than the same quarter in 2001), Kezsbom responded by attributing the increase in accounts receivable to "extended terms" being demanded by Recoton's customer base. Kezsbom made no mention of the alleged deferrals. (Compl.¶ 46.)

■ Defendants argue that the Complaint fails to allege that the delays caused a non-recognition at a month or quarter's end, or in any publicly-filed financial statements. (Doc. 90 at 17). While it is true that Rule 9(b) and the PSLRA require that the Complaint precisely identify which statements were rendered misleading by an omission, Defendants read the Complaint too narrowly. The Complaint states that Kezsbom instructed the executive "to delay recognizing, *in the Company's financial statements*, a substantial portion of customer returns." (Compl.¶ 46(iv)) (emphasis added). Later in the same paragraph, the Complaint states that the delay yielded an overstatement of $3 to $4 million in Recoton's accounts receivable balances. Further, Plaintiffs' Exhibit A [12]

---

12. Defendants object to the Court's consideration of Exhibit A (Doc. 77) because it was not filed with the Complaint (Doc. 76). However, Plaintiffs explained that the separate filing of Exhibit A was inadvertent. Further,

Plaintiffs refer to Exhibit A in paragraph 37 of the Complaint. Additionally, Plaintiffs served Defendants with the Exhibit shortly after serving the Complaint. As such, Exhibit A is properly considered.

identifies the reported accounts receivable figures for December 2001, March 2002, and June 2002 as having overstated accounts receivable. These reported figures match the figures reported in the December 31, 2001 Form 10–K and respective Forms 10–Q. Reading the Complaint in the light most favorable to the Plaintiffs, the Complaint sufficiently alleges that Recoton's 2001 Form 10–K, March 2002 Form 10–Q, June 2002 Form 10–Q, and Kezsbom's statement to the analyst were rendered materially misleading by the alleged practice of purposefully deferring credits.

██ Defendants also argue that an overstatement of $3 to $4 million was not material in light of the 2002 first and second quarter accounts receivable that amounted to $155 million and $144 million respectively. Plaintiffs do not respond to this argument. However, at this motion to dismiss stage, it cannot be said that a $3 to $4 million deferral in three consecutive quarters is immaterial as a matter of law. *See, e.g., In re Unicapital Corp. Sec. Litig.,* 149 F.Supp.2d 1353, 1364 (S.D.Fla. 2001) ("Materiality... is a question of fact that may rarely be resolved at the motion to dismiss stage.") (citation omitted); *In re Hamilton Bankcorp, Inc. Sec. Litig.,* 194 F.Supp.2d 1353, 1356 (S.D.Fla.2002) ("[M]ateriality is a question of fact that typically is not resolved at [the motion to dismiss] stage of the proceedings.") (citation omitted); *Holmes v. Baker,* 166 F.Supp.2d 1362, 1372 (S.D.Fla.2001) (same).

Plaintiffs' allegation of Recoton's $3 to $4 million artificial inflation of accounts receivable has pled fraud with particularity

under Rule 9(b) and 15 U.S.C. § 78u–4(b)(1). As substantiated by the finance executive who allegedly carried out Kezsbom's instruction to defer credits, Plaintiffs contend that Defendants artificially inflated accounts receivable figures for the sake of retaining and increasing financing from lenders. Whether Plaintiffs have satisfied the scienter requirement with regard to each Defendant is addressed in Part III(B).

iii) Inflated Revenues

Plaintiffs contend that Recoton recorded artificially inflated revenues by (1) recognizing sales before the time period for product returns had expired and (2) recording certain product swaps as a simultaneous sale of inventory and purchase of inventory. Such practices, Plaintiffs contend, were materially misleading due to the following Recoton statements: (1) "sales are recognized when merchandise is shipped" [13] and (2) "the customer takes title and assumes the risks and rewards of ownership of the products when the merchandise leaves the Company's warehouse." [14][15]

██ Plaintiffs' allegation fails to sufficiently particularize fraud. The majority of anonymous statements relied upon by Plaintiffs allege no more than that Recoton had a "liberal" return policy. [16] The existence of a liberal return policy fails to render the above statements materially misleading because immediately following such statements Recoton disclosed that provisions were made for "anticipated discounts, returns and allowances." [17] While

---

**13.** Recoton's Forms 10–K for 1999, 2000, and 2001 (Compl.¶¶ 41–42.)

**14.** Recoton's Forms 10–K for 2000 and 2001. (Compl.¶ 42.)

**15.** In addition to these misrepresentations, Plaintiffs allege three omissions which are

deemed inseparable from the alleged misrepresentations and are given the same consideration. *See* Compl. ¶ 46(i)-(iii).

**16.** *See* Compl. ¶ 43(ii)(iii).

**17.** Recoton's Forms 10–K for 1999, 2000, and 2001. (Compl.¶¶ 41–42.)

one anonymous statement sufficiently supports a GAAP violation pertaining to returns,[18] Plaintiffs fail to support the GAAP violation pertaining to product swaps.[19] Additionally, Plaintiffs fail to specify how often the allegedly improper returns and swaps occurred, to what severity, and how they affected public financial statements. *See In re Sunstar Sec. Healthcare Litig.*, 173 F.Supp.2d 1315, 1319 (M.D.Fla.2001) (finding that the plaintiffs had "failed to quantify the number of claims affected by such a policy, the dollar amount of claims delayed or unpaid, or the extent to which the practice affected the company's reported financial results"); *Malin v. Ivax Corp.*, 17 F.Supp.2d 1345, 1360 (S.D.Fla.1998) (finding that the complaint failed to allege to what extent the fraud affected financial

projections).[20] It is well established that allegations of GAAP violations alone fail to satisfy the particularity requirement of Rule 9(b). *Ziemba*, 256 F.3d at 1208–09 (citing cases). Finally, even if Plaintiffs had sufficiently particularized fraud, the allegation is devoid of any suggestion that the Defendants had actual knowledge or were informed directly of the improper reporting of returns and swaps. This allegation, therefore, is insufficient under Rule 9(b) and 15 U.S.C. § 78u–4(b)(1) & (2) and is not addressed in Part III(B).

iv. Factors Causing Decline at InterAct

Plaintiffs allege that the Defendants misrepresented the actual factors underlying InterAct's financial and operational declining results. Recoton's public docu-

---

18. Under GAAP, arrangements in which customers buy products for resale with the right to return products are called "guaranteed sales." (Compl.¶ 44(i)) (citing FASB Statement No. 48.) Revenue from such a sales transaction may be recorded at the time of sale only if six criteria are fulfilled, one of which requires that the buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product. (Compl.¶ 44(ii)(iii))(citing FASB Statement No. 48.) Only one anonymous employee, who is not alleged to hold a position that would assure knowledge of such activity, states that Recoton sold merchandise to a buyer who "remitted payment only for the merchandise it could actually sell to its retail customers." (Compl.¶ 43(i).)

19. Plaintiffs allege that, as a condition precedent to an exchange, some retailers required Recoton to purchase product off of the retailer's shelves to free up shelf space for Recoton products. According to Plaintiffs, Recoton was required under GAAP to record the trade of its inventory for the competitors' inventory solely as an exchange of products with no revenue recognized upon the completion of the exchange and, upon sale of competitors' inventory, Recoton was required to report a sale at the invoiced amounts. (Compl.¶ 43(iv)) (citing GAAP APB Opinion No. 29.) Instead, Recoton allegedly recorded the swap as a *simultaneous* sale of inventory

and purchase of inventory. For this allegation of improper recording. Plaintiffs rely on the statement of one anonymous employee. (Compl.¶ 43(v).) Plaintiffs fail, however, to allege that Recoton performed the swapping arrangement with "competitors" as the GAAP provision relied upon requires. The GAAP APB Opinion No. 29 provision cited by Plaintiffs states:

> [S]wapping inventories between enterprises that are essentially competitors and *not customers* of each other is merely an incidental early stage of an earning process, and revenue should not be recognized until the time of sale of the exchanged products (in the same or another form) to a customer of the enterprise.

GAAP APB Opinion No. 29 (emphasis included).
Indeed, the Complaint makes reference to these swaps being performed with companies such as Wal–Mart and Best Buy, both of which the Complaint identified as customers. *See, e.g.*, Compl. ¶ 62.

20. In an apparent effort to quantify the damage caused by the return policy, Plaintiffs submit testimony estimating the overall total of "defective product returns." (Compl.¶ 43(vii).) Plaintiffs, however, fail to connect this total sum to the alleged practice of recognizing sales before the return period had expired.

ments attributed InterAct's decline to industry-wide factors including i) the general transition of the video game industry, ii) competitive pricing pressures, iii) the cost of air freighting goods for product launches, iv) the introduction of new gaming platforms, v) the high cost of maintaining third party market leadership, and vi) increased competition.[21] Plaintiffs contend that the actual factors causing InterAct's declining performance were disclosed to lenders during the July 2002 presentation. Plaintiffs cite seven such factors: i) STD, a supplier of InterAct, functioned as "an inefficient, high cost producer, which could not supply the product range at competitive prices" ii) "excessive overhead;" iii) "excessive price protection (mark-down allowances given to retailers);"[22] iv) "excessive defective product returns;" v) "losses speculating with new product introductions;" vi) "excess and slow moving inventory;"[23] and vii) "poor and unstable management." Plaintiffs rely on various anonymous former employees to contend that all of the issues, except "excessive overhead,"[24] had become "manifest and widely known" throughout the Company no later than January of 2000. (Compl.¶¶ 51–52.)

 Plaintiffs have failed to plead fraud with particularity. First, it is not enough to allege that a reasonable investor might have liked to know about such asserted omissions. Rather, an omission is actionable under the securities laws only when the corporation is subject to a duty to disclose the omitted facts. *Rudolph v. Arthur Andersen & Co.,* 800 F.2d 1040, 1043 (11th Cir.1986) ("[A] defendant's omission to state a material fact is proscribed only when the defendant has a duty to disclose."). A duty to disclose arises "[w]here a defendant's failure to speak would render the defendant's *own* prior speech misleading or deceptive." *Id.* Without more specificity as to the severity of the allegations and their effect upon public financial statements, the Complaint fails to show that the alleged factors constituted anything more than internal problems that did not obligate disclosure. *See In re N. Telecom Ltd. Sec. Litig.,* 116 F.Supp.2d 446, 459 (S.D.N.Y.2000) ("A company is generally not obligated to disclose internal problems because the securities laws do not require management to bury the shareholders in internal details and because public disclosure of internal management ... falls outside the securities laws.") (internal quotations and citations omitted). Second, Plaintiffs' assertion that the Defendants had knowledge of the alleged omissions prior to the July 2002 disclosure is insufficiently supported. Plaintiffs' reliance on vague statements from anonymous employees[25] fails the scienter requirement of the PSLRA. There is no suggestion that any particular Defendant had knowledge of the factors prior to disclosure. This allegation, therefore, is inadequate under Rule 9(b) and 15

---

21. These industry-wide factors are found in various Forms 10–K and 10–Q throughout the Class Period. *See* Compl. ¶ 49.

22. The only support given for this omission reiterates the misrepresentations and omissions alleged in Part III(A)(ii)-(iii). *See* Compl. ¶ 52(iii).

23. This omission is nothing more than a repackaging of the allegation addressed in Part III(A)(i).

24. Plaintiffs fail to allege that Defendants had knowledge of "excessive overhead" prior to the July 25, 2002 presentation. *See* Compl. ¶ 52(ii).

25. Plaintiffs attempt to show knowledge by alleging that a certain factor became "manifest and widely known at the Company no later than January, 2002" (Compl.¶ 52(iii)) or that an event became "hot and heavy" as early as mid–1999 (Compl.¶ 52(iv).) To allege a strong inference of scienter under the PSLRA, more specificity is required.

U.S.C. § 78u–4(b)(1) & (2) and is not addressed in Part III(B).

### v. InterAct's Strategic Business Plan

Plaintiffs contend that Recoton made material misrepresentations about the timing of the implementation of a Strategic Business Plan ("SBP") at InterAct. In a December 31, 1999, Form 10–K, Recoton stated that InterAct recorded "1.1 million in charges ... in 1999 in connection with the Strategic Plan." (Compl.¶54(i).)[26] Plaintiffs allege that Recoton did not, in fact, begin executing the SBP until late in the first quarter of 2002. To support this claim, Plaintiffs rely on a May 8, 2002 press release stating:

> The continued losses at the video game segment were the major factor in the Company's net loss for the first quarter. Steps to determine and implement the changes required to help restore this business segment to profitability *were begun late in the first quarter of 2002,* but the benefits of these actions will not be realized until further into the year.

(Compl.¶ 58)(emphasis added.)

 Plaintiffs' allegation fails to particularize fraud. First, the fact that the May 8, 2002 press release states that "steps" were begun in the first quarter of 2002 to restore InterAct does not necessarily contradict that $1.1 million was charged in 1999 at InterAct in connection with the SBP. It is certainly feasible that both could be true. Perhaps the 1999 funding of InterAct did not materialize into substantive change until the first quarter of 2002. Or perhaps the steps taken in the first quarter of 2002 were completely unrelated to the $1.1 million investment in 1999. As the allegation stands, it fails to adequately plead an instance of negligence or mismanagement, let alone fraud. Fur-

ther, Plaintiffs have failed to show what Defendants stood to gain by purposefully delaying the implementation of the plan. Finally, the allegation altogether lacks any inference of scienter as to a particular Defendant. This allegation, therefore, is insufficient under Rule 9(b) and 15 U.S.C. § 78u–4(b)(1) & (2) and is not addressed in Part III(B).

### vi. Recoton's Declining Fill Rates and Relations with Customers

Plaintiffs allege that Recoton concealed and omitted from public statements that the Company was losing or in danger of losing important customers due to its struggle in meeting supply requirements beginning no later than the fourth quarter of 2001. (Compl.¶¶ 25(v), 61–69.)

Many of Recoton's customers, including its two largest (Wal–Mart and Best Buy), demanded, as a prerequisite to doing business, that Recoton meet a minimum percentage of the customers' orders, a percentage commonly referred to as a "fill rate." (Compl.¶ 61.) Plaintiffs allege that Recoton failed to disclose declines in fill rates and the adverse effects such declines were having on business relationships. Plaintiffs further allege that Robert Borchardt was asked by an analyst, during a May 9, 2002 conference call, about lost shelf-space at Wal–Mart and whether any Recoton accounts were potentially in jeopardy. Plaintiffs contend that Borchardt's responses omitted the fact that Wal–Mart had been complaining about the Company's failure to achieve adequate fill rates as of that date.

 Plaintiffs' allegation fails to adequately particularize fraud. Plaintiffs fail to describe how the alleged fill rate prob-

---

**26.** Plaintiffs refer to various other press releases and Forms 10–K and 10–Q that reference the SBP, including a September 30,

2000 10–Q that reiterates the same $1.1 million charge at InterAct in connection with the SBP. (Compl.¶¶ 54–57.)

lem rose to a level that obligated disclosure or that it was anything more than an internal problem unsuitable for public disclosure. *See In re N. Telecom*, 116 F.Supp.2d at 459. Plaintiffs identify only one division—the Jensen audio division—as having a drop in fill rates and no specificity is provided as to when the drop occurred. (Compl.¶ 62.) Similarly, only one customer, Wal–Mart, is identified as having complained about deficient fill-rates and no specifics are given as to when Recoton was receiving such complaints. (Compl.¶¶ 62, 67). Further, the allegation fails to support a strong inference of scienter as to any Defendant. There is no suggestion that Defendants were aware of the alleged fill rate problem and the threat it posed to customers. The Complaint's allegation that Borchardt knew of the Wal–Mart complaints at the time of the May 9, 2002 conference call is factually unsupported. *See* Compl. ¶ 67. This allegation, therefore, is inadequate under Rule 9(b) and 15 U.S.C. § 78u–4(b)(1) & (2) and is not addressed in Part III(B).

### vii. Recoton's Executive Compensation

Plaintiffs allege that Recoton made a material misrepresentation concerning its executive compensation. On April 30, 2002, Recoton filed a Form DEF 14A stating: "Bonuses which were paid to executive officers with respect to 2001 results were based on such persons achieving such individual business objectives." (Compl.¶ 70.) This statement was false, Plaintiffs contend, because the bonuses were not paid to executives based on achievement of business objectives; rather, bonuses were paid in advance of achievement and the bonuses were required to be returned when goals were not met. To support this claim, Plaintiffs rely

on Recoton's Form 10–Q for the period ending June 30, 2002, which stated that $900,000 in charges were recorded for the "forgiveness of receivables." The same document identified the forgiven receivables as being "associated with a contractual bonus program that required certain management to reimburse the Company for losses incurred." (Compl.¶ 71.)

█ Plaintiffs' allegation fails to plead fraud with particularity. To state a claim, Plaintiffs must link the specific bonuses paid to "executive officers" discussed in Form DEF 14A filed in April with the bonuses paid to "certain management" stated in the June, 2002, Form 10–Q. As the claim stands, there is no necessary connection between the two bonus programs, and absent this connection, Plaintiffs fail to allege a misrepresentation. Further, Plaintiffs fail to explain what Defendants stood to gain by this action and how such action constituted fraud and not mere negligence. Finally, the allegation fails to support a strong inference of scienter on the part of any Defendant. The allegation, therefore, is insufficient under Rule 9(b) and 15 U.S.C. § 78u–4(b)(1) & (2) and is not addressed in Part III(B).

### viii. Fraudulent Audit Opinions

Plaintiffs' allegations against D & T span sixty-five paragraphs (Compl.¶¶ 26, 73–136) and twenty-two pages. Plaintiffs allege that D & T issued audit opinions either knowing or in reckless disregard of the alleged fraud at Recoton. D & T's knowledge or reckless disregard of the fraud may be inferred. Plaintiffs insist, from the "magnitude of the fraud," seven "red flags," and violations of GAAP and "generally accepted auditing standards" ("GAAS").[27]

---

**27.** GAAS are the standards prescribed by the Auditing Standards Board of AICPA for the conduct of auditors in the performance of an examination. *See Ziemba,* 256 F.3d at 1200 n. 3.

■ The allegations against D & T fail to plead fraud with sufficient particularity. Plaintiffs do not cite any documents, testimony or evidence indicating that D & T, or any particular D & T employee, was informed or participated in Recoton's alleged wrongdoings. Conclusory allegations that do no more than state that D & T "would have known," [28] "knew and ignored," [29] or "recklessly failed to know" [30] are insufficient to state a claim under PSLRA and Rule 9(b). *In re Sunterra*, 199 F.Supp.2d 1308, 1324 (M.D.Fla. 2002) (holding that mere allegations of "must have known" fail to pass muster under the PSLRA). The alleged violations of GAAP and GAAS are often devoid of factual support [31] and do little more than base each violation on the assumption that the above-mentioned allegations are true. In any event, it is well-settled that allegations of GAAP and GAAS violations are insufficient, by themselves, to state a claim of fraud with particularity. *Ziemba*, 256 F.3d at 1208–09 ("[A]llegations of violations of GAAS or GAAP, standing alone, do not satisfy the particularity requirement of Rule 9(b).").

In addition to failing the first prong of the PSLRA, Plaintiffs fail the second prong requiring the pleading to give rise to a strong inference of scienter. Plaintiffs contend that seven "red flags" should have put D & T on notice of the alleged fraud at Recoton. "Red flags" are facts that come to the attention of an auditor that "would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors." *In re Sunterra*, 199 F.Supp.2d at 1333; *see Van de Velde v. Coopers & Lybrand*, 899 F.Supp. 731, 736 (D.Mass.1995) (stating that red flags must be "sufficiently attention-grabbing to have

alerted a reasonable auditor to the audited company's shenanigans" to survive a motion to dismiss); *Nappier v. Pricewaterhouse Coopers LLP*, 227 F.Supp.2d 263, 278 (D.N.J.2002) (stating that red flags "must be closer to smoking guns than mere warning signs") (internal quotations and citation omitted). The red flags listed by Plaintiffs are as follows: a) D & T reviewed Recoton's periodic reports; b) Recoton officers had stock options; c) D & T occupied an office in Recoton's Headquarters; d) insider selling; e) Recoton's desire to maintain a high valuation for its inventory because it was secured by lenders; f) Recoton's hiring of D & T after lenders had insisted upon a new auditor; and g) D & T's knowledge that Recoton had pled guilty in 1999 to falsifying customs documents.

■ Plaintiffs' alleged red flags are insufficient to put D & T on notice of the alleged fraud. Red flags (a)-(c) fail to allege anything out of the ordinary. Red flag (d), "insider selling," is insufficiently substantiated, as Plaintiffs do little more than show that three of the Individual Defendants sold stock once at various times during the Class Period. *Cheney v. Cyberguard Corp.*, No. 98–6879, 2000 WL 1140306, at *8 (S.D.Fla. July 31, 2000) ("The plaintiffs ... bear the burden of showing that sales by insiders were in fact unusual in amount and in timing."); *In re Sunterra*, 199 F.Supp.2d at 1330; *In re Credit Acceptance Corp. Sec. Litig.*, 50 F.Supp.2d 662, 677 (E.D.Mich.1999); *In re MicroStrategy, Inc. Sec. Litig.*, 115 F.Supp.2d 620, 643 (E.D.Va.2000). Red flag (e) alleges a motive for Recoton that could be affixed to any company with secured inventory. Since a showing of motive by itself is

**28.** *See, e.g.,* Compl. ¶ 91.

**29.** *See, e.g.,* Compl. ¶¶ 87, 104, 106.

**30.** *See, e.g.,* Compl. ¶ 92.

**31.** *See, e.g.,* Compl. ¶¶ 93, 94.

insufficient to plead scienter, *Bryant,* 187 F.3d at 1287, it is especially clear that a showing of motive on behalf of an accounting firm's client is insufficient to plead scienter with regard to the accounting firm. Red flag (f), the lenders' insistence on the hiring of D & T, is unrelated to any of the fraud allegations. The Complaint itself states that the lenders' insistence on hiring D & T stemmed from the requirement to use "an international auditing firm with offices in each of the countries in which Recoton's subsidiaries operate[d]." (Compl.¶ 134.) Likewise, red flag (g), Recoton's 1999 guilty plea to falsifying customs documents, is unrelated to any of the particular allegations of fraud in the Complaint. Plaintiffs' assertion that such an incident should have given rise to a heightened level of skepticism on the part of D & T might be correct, but the crux of the current analysis is whether the red flag provided reasonable notice of Plaintiffs' specific allegations of fraud. Because red flag (g) is wholly unrelated to the alleged wrongdoings, it could not have provided reasonable notice.

This allegation, therefore, is insufficient under Rule 9(b) and 15 U.S.C. § 78u–4(b)(1) & (2) and is not addressed in Part III(B).

## B. Scienter as to the Individual Defendants

Six of Plaintiffs' substantive allegations have been determined to be inadequate, including all of the allegations pertaining to D & T. It remains to be determined whether Plaintiffs' two remaining bases for fraud—Recoton's inflated inventories and inflated accounts receivable—satisfy the scienter requirement of the PSLRA, 15 U.S.C. § 78u–4(b)(2). Plaintiffs must show severe recklessness on the part of each Defendant and with respect to each substantive allegation. *Phillips v. Scientific–Atlanta, Inc.,* 374 F.3d 1015, 1018 (11th

Cir.2004). Severe recklessness is " 'limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or so obvious that the defendant must have been aware of it.' " *Bryant,* 187 F.3d at 1282 n. 18 (internal quotation omitted).

■■■ Plaintiffs allege that the Individual Defendants knew that public documents issued by the Company were materially false and misleading and participated or acquiesced in the dissemination of such documents. (Compl.¶ 140.) Three anonymous witnesses attest that each of the Individual Defendants would receive drafts of, and would be required to approve and sign off on, all SEC filings and Company press releases implicating financial or operational matters. (Compl.¶ 141(x).) Additionally, Plaintiffs allege that the Individual Defendants had access to detailed and current financial information via the company computer system. (Compl.¶ 140.) These allegations, by themselves, fail to raise a strong inference of scienter as to any of the substantive allegations. *See, e.g., Cyberguard,* 2000 WL 1140306, at *9 ("[I]t is well-established that '[a]llegations that a director or officer signed public disclosures and/or was involved in the company's daily operations, standing alone, will not satisfy the pleading requirements of the PSLRA or Rule 9(b).' ") (quoting *In re Cendant Corp. Sec. Litig.,* 76 F.Supp.2d 539, 547 (D.N.J.1999)). They will, however, be considered in conjunction with the more specific inferences of scienter mentioned below.

### i. Clark

Plaintiffs allege that Tracy Clark, Recoton's Chief Accounting Officer ("CAO") be-

tween 2000–2001, signed the 1999, 2000, and 2001 Forms 10–K (Compl.¶ 10) and had knowledge of document shredding. Four anonymous employee witnesses state that the shredding was unprecedented in volume and one witness observed that at least some documents taken to be shredded were financial statements. The shredding allegedly began in the second quarter of 2002 and continued indefinitely. (Compl.¶ 142.)

■ Plaintiffs have failed to adequately allege a strong inference of scienter as to Clark. The above allegations do not amount to a showing of severe recklessness. Plaintiffs' allegations are devoid of any suggestion that Clark had actual knowledge about any of the substantive allegations. Accordingly, Plaintiffs' claims against Clark must be dismissed.

ii. Mont

Plaintiffs allege that Stuart Mont acted as Recoton's Chief Operating Officer, Executive Vice President, and Director during the Class Period. Mont allegedly signed each of Recoton's Forms 10–K during the Class Period as well as Recoton's Forms 10–Q for March 31, 2000, June 30, 2000, September 30, 2000, September 30, 2001, and March 31, 2002. (Compl.¶ 10.) Plaintiffs allege four additional inferences of scienter against Mont. First, Mont locked himself in his office and shredded documents for two consecutive days. (Compl.¶ 142). Second, Mont was identified by an anonymous employee as being a person who "knew exactly what was going on" at the Company. (Compl.¶ 141(iv)(a).) Third, according to an anonymous divisional executive, the backlog of inventory at InterAct was brought to the attention of the Directors, including Mont, at quarterly meetings between the directors and divisional executives before January 2002 and thereafter. (Compl.¶ 141(i).) Fourth,

Mont sold 16,066 shares at $18, generating $289,188 of proceeds. (Compl.¶ 145.)

■ The allegations against Mont fail to support a strong inference of scienter. Document shredding, without more information as to what was shredded and when it was done, is insufficient to establish a strong inference of scienter. The same is true for the sale of stock. There is no showing that the trading was inconsistent with Mont's trading history or part of an unusual trading pattern. *Cyberguard,* 2000 WL 1140306, at *8. Instead, Plaintiffs rely on the fact that Mont's stock sale was approximately one month before the July 26, 2001 Class Period price high of $20.49—a fact that does not constitute unusualness. As other courts have stated, "[k]nowledge is the foundation of scienter." *In re AFC Enters., Inc. Sec. Litig.,* 348 F.Supp.2d 1363, 1373 (N.D.Ga.2004) (quoting *In re Theragenics Corp. Sec. Litig.,* 105 F.Supp.2d 1342, 1360 (N.D.Ga. 2000)). The Complaint alleges no facts supporting a conclusion that Mont had actual knowledge about any instance of fraud at Recoton. The statement that Mont "knew exactly what was going on" is embarrassingly vague and the discussions at quarterly meetings that included "inventory backlog" require more specificity. Plaintiffs must detail what was discussed at the meeting, by whom, and why such discussion would have alerted Mont to the alleged fraud. Accordingly, Plaintiffs' claims against Mont must be dismissed.

iii. Borchardt and Kezsbom

Robert Borchardt served as Recoton President, Chief Executive Officer, Chairman, and Director. Borchardt signed all Forms 10–K during the Class Period and Forms 10–Q for March 31, 2001, June 30, 2001, June 30, 2002, and September 30, 2002. (Compl.¶ 10.) Borchardt also allegedly sold ten percent of his stock holdings,

yielding $1,158,000 in proceeds on June 29, 2001. (Compl.¶ 145(ii).) According to an anonymous Recoton divisional Senior Vice President, Borchardt spoke "firmly" about InterAct's unsold inventory to the President of InterAct's manufacturing subsidiary. Paul Stephen Chu, at a January 8–11, 2002, Consumer Electronics Show. Subsequent to the conversation Chu allegedly left the show and sold a sum of stock. According to Plaintiffs, a published report confirms that Chu sold 10,000 shares of Recoton stock at $14.01 between January 9–10, 2002. (Compl.¶ 141(viii).)

Arnold Kezsbom served as Recoton's Executive Vice President of Finance, Chief Financial Officer, and Director. Kezsbom signed all of the Forms 10–K and 10–Q filed during the Class Period. (Compl.¶ 10.) Kezsbom also allegedly exercised an option for 3,000 shares at $7.44 and immediately thereafter sold 3,000 shares at $19.00, generating proceeds of $57,000 on June 6, 2001. (Compl.¶ 145(i).) According to four anonymous Recoton employees, the unprecedented volume of paper shredding between the second quarter of 2002 and extending indefinitely was "at the behest and with the participation of … Kezsbom." (Compl.¶ 142.)

Borchardt and Kezsbom were both allegedly confronted by George Calvi, a Recoton Director and Executive Vice President, concerning the accuracy of inventory valuations in 1999. Calvi stated, in relevant part:

> I believe that … greatly increased inventory figures were used in order to obtain the refinancing that Recoton was seeking. Contrary to its assertion in its public filings that the inventory increases amounted merely to "stocking up" in anticipation of high demand, the company's video game inventory was becoming obsolete and would not be able to be sold since it would not be compatible with new videogame technology that would be coming onto the market…. In addition to overvaluing its inventory, Recoton furnished its lenders with inflated projections for its income and profits. *In 1999, I questioned Recoton's Chairman and CEO, Robert Borchardt, and its CFO, Arnold Kezsbom, about the accuracy of the projections and the inventory valuation figures included in the reports provided to lenders with respect to the company's gaming division. Borchardt and Kezsbom assured me that the figures were accurate. I later learned that the figures were not accurate.* Kezsbom also ordered Recoton employee [sic] that all letter of credit discrepancies were to be hidden from Jeffries & Company, an investment banking firm that Recoton had retained to assist in the sale of certain assets, but not from Zolfo Cooper, the consulting firm that Recoton had retained as a condition of its refinancing and which reported Recoton's financial condition to the lenders. In reporting inaccurate numbers to the lenders, Kezsbom secured the cooperation of Alex Sarokin of Zolfo Cooper.

(Compl.¶ 141(ix)) (emphasis added).

Defendants argue that the Calvi statement does no more than allege that Calvi questioned or disagreed with Defendants on financial statements, which cannot support a strong inference of scienter. (Doc. 126 at 18–19.) Defendants' attempt to downplay the significance of Calvi's statement is unsuccessful. The statement is unique in that it is from a named source who held the position of Recoton Director. Further, the statement specifically describes whom Calvi confronted and what was discussed. Calvi questioned both Borchardt and Kezsbom about "the accuracy of the projections and the inventory valuation figures" with respect to the gaming division. When Calvi's statement is con-

sidered in the aggregate with other limited inferences such as Borchardt's position as CEO, Kezsbom's position as CFO, the motive to retain and increase financing for Recoton, the "unprecedented" amount of paper shredding ordered by Kezsbom, and Calvi's additional statements about misleading lenders and concealing credit discrepancies from the investment banking firm, it is clear that Plaintiffs have sufficiently alleged facts giving rise to a strong inference of scienter. Other courts have come to similar conclusions. *See, e.g., In re Sunbeam,* 89 F.Supp.2d 1326, 1338 (S.D.Fla.1999) (holding that plaintiffs sufficiently pled scienter by alleging, among other things, that the defendant officers had been "directly confronted" concerning Sunbeam's revenue recognition practices); *In re Ikon Office Solutions, Inc. Sec. Litig.,* 66 F.Supp.2d 622, 629–30 (E.D.Pa. 1999) (holding that scienter was sufficiently supported when plaintiffs alleged that the accounting firm had been informed that the CFO was "cooking the books"); *In re Health Mgmt., Inc. Sec. Litig.,* 970 F.Supp. 192, 203 (E.D.N.Y.1997) (holding that an analyst's letter warning the accounting firm about artificially inflated accounts receivable was sufficient, when grouped with other inferences, to satisfy the scienter requirement). With respect to the allegation of inventory inflation as to Individual Defendants Borchardt and Kezsbom, therefore, Plaintiffs have alleged a strong inference of scienter under 15 U.S.C. § 78u–4(b)(2).

Plaintiffs also identified Kezsbom in their allegations concerning inflated accounts receivable. An anonymous Recoton executive attested to receiving a personal instruction from Kezsbom, throughout fiscal year 2002, to delay recognizing a substantial portion of customer returns, credits, and other deductions pertaining to all Recoton customers and divisions. Accord-

ing to the Recoton executive, the delay caused a $3 to $4 million overstatement in the Company's accounts receivable balances for each quarter of 2002, which in turn led to an overstatement in available cash for each quarter. (Compl.¶¶ 46(iv), 141(i), 144.) Plaintiffs add that during a first quarter 2002 analyst conference call, Kezsbom did not disclose his directive to delay the posting of credits and refunds when questioned about the accounts receivable. (Compl.¶ 47.)

Defendants' argument against a finding of scienter is a reiteration of the same argument addressed in Part III(A)(ii), supra: that the Complaint does not specifically allege that overstatements were made in publicly-reported financial statements. (*See* Doc. 90 at 24; Doc. 126 at 19.) As discussed earlier, the Complaint does sufficiently allege such information.[32]

The testimony from the Recoton executive who received the personal instruction from Kezsbom, considered in the aggregate with the above mentioned inferences, sufficiently alleges a strong inference of scienter. The testimony alleges actual knowledge, participation, and instruction of the alleged fraud on behalf of Kezsbom from precisely the individual who received Kezsbom's directive. Therefore, with respect to the allegation of inflated accounts receivable, Plaintiffs have sufficiently alleged scienter on the part of Individual Defendant Kezsbom.

In sum, Plaintiffs have satisfied the heightened pleading requirements of Rule 9(b) and the PSLRA as to Borchardt and Kezsbom with respect to the alleged inflated inventories and as to Kezsbom with respect to the alleged inflated accounts receivable.

---

**32.** *See* Part III(A)(ii), supra.

## C. Loss Causation

Defendants' final argument is that Plaintiffs have failed to adequately allege loss causation. Whether Plaintiffs' two remaining allegations, inflated inventories and inflated accounts receivable, sufficiently allege loss causation will now be determined.

Under the Exchange Act, a plaintiff has the burden of showing that the misrepresentation made by the defendant "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u–4(b)(4); *see also Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 (11th Cir.1997); *Bruschi v. Brown*, 876 F.2d 1526, 1528 (11th Cir.1989). As explained by the Eleventh Circuit, "loss causation describes 'the link between the defendant's misconduct and the plaintiff's economic loss.'" *Robbins*, 116 F.3d at 1447 (quoting *Rousseff v. E.F. Hutton Co.*, 843 F.2d 1326, 1329 n. 2 (11th Cir.1988)). A plaintiff ultimately proves loss causation by showing "that the untruth was in some reasonably direct, or proximate, way responsible for his loss." *Id.* (citation and internal quotation omitted). Although a "plaintiff need not show that the defendant's act was the sole and exclusive cause of the injury," the plaintiff "must show that the misrepresentation touches upon the reason for the investment's decline in value." *Id.* (internal quotations omitted). Allegations of artificial price inflation alone do not satisfy the loss causation requirement. *Id.* at 1448.

The Complaint alleges that class members "were injured because the risks that materialized were risks of which they were unaware as a result of Defendants' scheme to defraud." (Compl.¶ 165.) The Complaint also alleges that "[a]s a direct and proximate result of Defendants' scheme to defraud and Defendants' unlawful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their purchases of Recoton common stock." (Compl.¶ 167.) Elsewhere, the Complaint alleges that "but for the omissions, the investing public would have been apprised of certain critical risk factors which could have contributed to and did, in fact, contribute to the Company's financial underperformance; to its financial demise; and, ultimately, to its bankruptcy." (Compl.¶ 69.)

Defendants argue that Plaintiffs' above-stated allegations do nothing more than plead that Plaintiffs paid artificially inflated prices for the stock and that more is required to plead loss causation under *Robbins*. Defendants are correct.

Even when analyzing the Complaint in the light most favorable to the Plaintiffs, the Complaint offers no indication that the alleged misrepresentations and omissions "touch" upon the reason for the investment's decline in value. Some type of relationship between the alleged fraud and the harm caused must be pled. *See e.g., Druskin v. Answerthink, Inc.*, 299 F.Supp.2d 1307, 1339 (S.D.Fla.2004) (granting motion to dismiss and holding that plaintiffs failed to plead loss causation); *Barr v. Matria Healthcare, Inc.*, 324 F.Supp.2d 1369, 1380 (N.D.Ga.2004) (same); *In re Premiere Tech. Inc.*, No. 1:98–CV–1804, 2000 WL 33231639, at *14 (N.D.Ga. Dec.8, 2000) (dismissing certain allegations that failed to plead loss causation); *see also Bastian v. Petren Res. Corp.*, 892 F.2d 680, 685 (7th Cir.1990) (affirming the district court's dismissal of a 10b–5 claim on loss causation grounds); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 199 (2nd Cir.2003) (holding that "securities fraud plaintiffs [must] demonstrate a causal connection between the content of the alleged misstatements or omissions and the harm actually suffered") (internal quotations omitted); *Semerenko v. Cendant Corp.*,

223 F.3d 165, 185 (3rd Cir.2000) ("[A]n investor must ... establish that the alleged misrepresentations proximately caused the decline in the security's value to satisfy the element of loss causation.").

Plaintiffs contend that two cases from this district, *In re PSS World Medical, Inc. Securities Litigation*, 250 F.Supp.2d 1335, 1351 (M.D.Fla.2002), and *Anderson v. Transglobe Energy Corp.*, 35 F.Supp.2d 1363, 1369, (M.D.Fla.1999), have held that allegations similar to those found in the Complaint satisfy the pleading requirements for loss causation. First, however, it is clear that the loss causation allegations in *PSS World* are distinguishable from the allegations in the instant case. In *PSS World*, plaintiff shareholders alleged that an August 2000 press release contained false and misleading financial results. Plaintiffs further alleged that PSS restated the results and that the restatement *caused* the termination of a merger agreement, which in turn *caused* the stock to drastically decline. *PSS World*, 250 F.Supp.2d at 1340. Thus, in *PSS World*, at least some type of causal nexus was asserted between an alleged misstatement and the alleged harm. The Complaint here alleges no such causal nexus.

Second, insofar as *PSS World* and *Transglobe* stand for the proposition that loss causation is adequately pled by doing no more than baldly stating that the allegations "proximately caused" the injury or "that there was a substantial likelihood that a reasonable investor would have considered a misrepresentation important," the Court respectfully disagrees. The clear holding of *Robbins* is that Plaintiffs must show that the "misrepresentation touches upon the reason for the investments decline." Without allegations supporting such a showing, the Complaint fails to give notice of proximate causation, a required element for a finding of fraud under the Exchange Act. Because Plain-

tiffs fail to adequately allege loss causation, Plaintiffs' remaining allegations of inflated inventory (as to Borchardt and Kezsbom) and inflated accounts receivable (as to Kezsbom) are insufficient. Accordingly, the claims against Borchardt and Kezsbom must be dismissed.

### D. Controlling Person Liability

Plaintiffs have failed to adequately plead a section 10(b) violation. Therefore, the section 20(a) controlling person claims necessarily fail and will be dismissed. The court need not address whether Plaintiffs have otherwise sufficiently alleged controlling person liability against any of the Defendants.

### E. Leave to Amend

In response to the motions to dismiss, Plaintiffs have requested leave to amend in the event this court dismisses any or all of the claims in the Complaint. (Doc. 111 at 35, n.64.) Despite the stringent standards of the PSLRA, leave to amend is generally proper unless such amendment would be futile. *Compare Ziemba*, 256 F.3d at 1194 (affirming denial of leave to amend complaint filed prior to enactment of the PSLRA after consideration of plaintiffs' proposed additional allegations), *with Bryant v. Dupree*, 252 F.3d 1161, 1164 (11th Cir.2001) (reversing as abuse of discretion district court's refusal of leave to amend where the plaintiffs had not previously been given opportunity to amend, had not been put on notice of deficiencies, and "indicated ... that if given the chance to amend, they will meet the PSLRA's pleading requirement"). Because Plaintiffs have not previously been given an opportunity to amend in the face of a motion to dismiss and because it does not clearly appear that any attempt to amend would necessarily be futile, under *Bryant* Plaintiffs are permitted one opportunity to

amend their complaint. Plaintiffs are advised, however, that failure to satisfy the PSLRA and loss causation requirements upon repleading may result in dismissal of their claims with prejudice.

## IV. CONCLUSION

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** as follows:

1. Defendant Deloitte & Touche's Motion to Dismiss (Doc. 94) is **GRANTED without prejudice.**

2. Individual Defendants' (Kezsbom, Borchardt, Mont. and Clark) Motion to Dismiss (Doc. 90) is **GRANTED without prejudice.**

3. The Consolidated Amended Class Action Complaint (Doc. 76) is hereby **DISMISSED without prejudice.**

4. Plaintiffs may file a second amended complaint **on or before Friday, April 1, 2005.**